## UNITED STATES SUPREME COURT.

### In the matter of the Petition of A. H. Garland.

Previous to the act of congress passed January 24, 1865, *attorneys and counsellors at law* were, under the second rule of the court, admitted to the bar of the supreme court of the United States, by presenting evidence to the court that they had been attorneys and counsellors at law for three previous years in the highest courts of the states to which they respectively belonged ; and that their private and professional character appeared to be fair.

On the 24th of January, 1865, congress passed a supplementary act, making the provisions of a former act passed July 2d, 1862, applicable to attorneys and counsellors at law ; by which last mentioned act they were required, before being admitted to the bar of the supreme court of the United States, to take and subscribe an additional oath ;

*First.* That the deponent has never voluntarily borne arms against the United States since he has been a citizen thereof ;

*Second.* That he has not voluntarily given aid, countenance, counsel or encouragement to persons engaged in armed hostility thereto ;

*Third.* That he has never sought, accepted, or attempted to exercise the functions of any office whatsoever, under any authority or pretended authority, in hostility to the United States ;

*Fourth.* That he has not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto ; and

*Fifth.* That he will support and defend the constitution of the United States against all enemies, foreign and domestic, and will bear true faith and allegiance to the same :

*Held,* 1st. That this statute, except the last clause, which is promissory only, is

In the matter of A. H. Garland.

directed against parties who have offended in any of the particulars embraced by the above clauses, and its object is to exclude them from the profession of the law, or at least from its practice in the courts of the United States.

2d. As the oath prescribed cannot be taken by these parties, the act as against them operates as a legislative decree of perpetual exclusion.

3d. An exclusion from any of the professions or any of the ordinary avocations of life for past conduct, can be regarded in no other light than as a punishment for such conduct.

4th. The exaction of the oath is the mode provided for ascertaining the parties upon whom the act is intended to operate, and instead of lessening, increases its objectionable character.

5th. All enactments of this kind partake of the nature of bills of *pains and penalties*, and are subject to the *constitutional inhibition against the passage of bills of attainder*, under which general designation they are included.

And 6th. In the exclusion which the statute adjudges, it imposes a punishment for some of the acts specified, which were not punishable, or may not have been punishable at the time they were committed ; and for all the acts it adds a *new punishment* to that then prescribed, and it is thus brought within *the further inhibition of the constitution against the passage of an ex post facto law* :

*Held*, further, that the effect of the *pardon* by the President, of the petitioner, is to relieve him from all penalties and disabilities attached to the offense committed by his participation in the rebellion, so far as that offense is concerned. He is thus placed beyond the reach of *punishment* of any kind. And it is not within the *constitutional power* of congress to inflict punishment beyond the reach of *executive clemency*.

From the petitioner, therefore, the oath required by the act of January 24th, 1865, cannot be exacted. The prayer of the petitioner must be granted, and the amendment to the second rule of the court, which requires the oath prescribed by the act of January 24, 1865, having been unadvisedly adopted, must be rescinded.

*Washington, D. C., January Term,* 1867.
*Present, all the justices.*

*By the court,* FIELD, J. On the 2d day of July, 1862, congress passed an act prescribing an oath to be taken by every person elected or appointed to any office of honor or profit under the government of the United States, either in the civil, military or naval departments of the public service, except the President of the United States, before entering upon the duties of his office, and before being entitled to its salary or other emoluments. On the 24th of January, 1865, congress passed a supplementary act, extending its provisions so as to embrace attorneys and counsellors of the courts of the United States ; which provides that after its passage no person shall be admitted as an attorney or counsellor to the bar of the supreme court, and after the 4th of

In the matter of A. H. Garland.

March, 1865, to the bar of any circuit or district court of the United States or of the court of claims, or be allowed to appear and be heard by virtue of any previous admission, or any special power of attorney, unless he shall have first taken and subscribed the oath prescribed in the act of July 2, 1862. The act also provides that the oath shall be preserved among the files of the court, and if any person take it falsely, he shall be guilty of perjury, and upon conviction shall be subject to the pains and penalties of that offense. At the December term of 1860, the petitioner was admitted as an attorney and counsellor of this court, and took and subscribed the oath then required by the second rule, as it then existed. It was only requisite to the admission of attorneys and counsellors of this court, that they should have been such officers for the three previous years in the highest courts of the states to which they respectively belonged; and that their private and professional character should appear to be fair. In March, 1865, this rule was changed by the addition of a clause requiring the administration of the oath, in conformity with the act of congress. In May, 1861, the state of Arkansas, of which the petitioner was a citizen, passed an ordinance of secession, which purported to withdraw the state from the union, and afterwards, in the same year, by another ordinance, attached herself to the so-called Confederate States, and by act of the congress of that confederacy, she was received as one of its members.

The petitioner followed the state, and was one of her representatives, first in the lower house, and afterwards in the senate of the congress of that confederacy, and was a member of the senate at the time of the surrender of the confederate forces to the armies of the United States. In July, 1865, he received from the President of the United States a full pardon for all offences committed by him by participation, direct or implied, in the rebellion. He now produces this pardon, and asks permission to continue to practice as an attorney and counsellor of the court without taking the oath required by the act of January 24, 1865, and the rule of this court, which he is unable to take by reason

of the offices he held under the Confederate government. He rests his application principally upon two grounds : first, that the act of January 24, 1865, so far as it affects his status in the court, is unconstitutional and void ; second, that if the act be constitutional, he is released from compliance with its provisions by the pardon of the President.

The oath prescribed by the act is as follows :   First, that the deponent has never voluntarily borne arms against the United States since he has been a citizen thereof ; second, that he has not voluntarily given aid, countenance, counsel or encouragement, to persons engaged in armed hostility thereto ; third, that he has never sought, accepted or attempted to exercise the functions of any office whatsoever, under any authority or pretended authority, in hostility to the United States ; fourth, that he has not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto ; fifth, that he will support and defend the constitution of the United States against all enemies, foreign and domestic, and will bear true faith and allegiance to the same. This last clause is promissory only, and requires no consideration.   The questions presented for our determination, arise from the other clauses.   These all relate to past acts. Some of these acts constituted, when they were committed, offenses against the criminal laws of the country, and some of them may or may not have been offenses, according to circumstances under which they were committed, and the motives of the parties.   The first clause covers one form of the crime of treason, and the affiant must declare that he has not been guilty of this crime, not only during the war of rebellion, but during any period of his life since he has been a citizen.   The second clause goes beyond the limits of treason, and embraces not only the giving of aid and encouragement of a treasonable nature to a public enemy, but also the giving of assistance of any kind to persons engaged in armed hostility to the United States.   The third clause applies to the seeking, acceptance or exercise, not only of offices created for the purpose of more effectu-

ally carrying on hostilities, but also of any of those offices which are required in every community, whether in peace or war, for the administration of justice and the preservation of order. The fourth clause not only includes those who gave a cordial and active support to the hostile government, but also those who yielded a reluctant obedience to the existing order established without their co-operation. The statute is directed against parties who have offended in any of the particulars embraced by these clauses, and its object is to exclude them from the profession of the law, or at least from its practice in the courts of the United States. As the oath prescribed cannot be taken by these parties, the act as against them operates as a legislative decree of perpetual exclusion. An exclusion from any of the professions, or any of the ordinary avocations of life, for past conduct, can be regarded in no other light than as a punishment for such conduct. The exaction of the oath is the mode provided for ascertaining the parties upon whom the act is intended to operate, and instead of lessening, increases its objectionable character. All enactments of this kind partake of the nature of bills of pains and penalties, and are subject to the constitutional inhibition against the passage of *bills of attainder*, under which general designation they are included. In the exclusion which the statute adjudges, it imposes a punishment for some of the acts specified, which were not punishable, or may not have been punishable at the time they were committed; and for all the acts it adds a new punishment to that then prescribed, and it is thus brought within the further inhibition of the constitution against the passage of an *ex post facto* law. In the case of *Cummings* agt. *The State of Missouri*, just decided, we had occasion to consider at length the meaning of a *bill of attain·er* and an *ex post facto* law, in the clause of the constitution forbidding their passage by the states, and it is unnecessary to repeat here what we then said. A like prohibition is contained in the constitution against enactments of this kind by congress, and the argument presented in that case against certain clauses of the constitution of Missouri, is equally applicable

to the act of congress under consideration in this case.   The
profession of an attorney and counsellor is not like an office
created by an act of congress, which depends for its contin-
uance, its powers and its emoluments, on the will of its cre-
ator, and the possession of which may be burdened with any
conditions not prohibited by the constitution.   Attorneys
and counsellors are not officers of the United States.   They
are not elected or appointed in the manner prescribed by
the constitution for the election or appointment of such offi-
cers.   They are officers of the court, admitted as such by its
order, upon evidence of their possessing sufficient legal learn-
ing, and fair private character.   Since the statute of *Henry
IV*, it has been the practice in England, and it has always
been the practice in this country to obtain this evidence by
an examination of the parties.   In this court, the fact of
the admission of such officers in the highest court of the
states to which they respectively belong, for three years pre-
ceding their application, is regarded as sufficient evidence
of the possession of the requisite legal learning, and the
statement of counsel moving their admission, is sufficient
evidence that their private and professional character is fair.
The order of admission is the judgment of the court that
the parties possess the requisite qualifications as attorneys
and counsellors, and are entitled to appear as such, and con-
duct causes therein.   From its entry, the parties become
officers of the court, and are responsible to it for profes-
sional misconduct.   They hold their office during good
behavior, and can only be deprived of it for misconduct,
ascertained and declared by the judgment of the court, after
opportunity to be heard has been afforded.   Their admission
and their exclusion are not the exercise of a mere ministe-
rial power.   The court is not in this respect the register of
the edicts of any other body.   It is the exercise of judicial
power, and has been so held in numerous cases.   It was so
held by the court of appeals of New York, in the *Matter of
the Application of Cooper* (*see* 22 *N. Y. R.* 67, *S. C.* ; 20 *How.
Pr. R.* 1), for admisson.   Attorneys and counsellors, said
that court, are not only officers of the court, but officers

whose· duties relate almost exclusively to proceedings of a judicial nature, and hence· their appointment may with propriety be entrusted to the courts. And the latter, in performing this duty, may very justly be considered as engaged in the exercise of their appropriate judicial functions. In *ex parte Secomb*, a mandamus to the supreme court of the territory of Minnesota, to vacate an order removing an attorney and counsellor was denied by this court, on the ground that the removal was a judicial act. We are not aware of any case, said the court, where· a mandamus was issued to an inferior tribunal, commanding it to reverse or annul its decision, where the decision was in its nature a judicial act, and within the scope of its jurisdiction and discretion. And in the same case, the court observed that it has been well settled by the rules and practice of common law courts, that it rests exclusively with the courts to determine who is qualified to become one of its officers as an attorney and counsellor, and for what causes he ought to be removed. The attorney and counsellor, being by the solemn judicial act of the court clothed with his office, does not hold it as a matter of grace and favor; the right which it confers upon him to appear for suitors and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the legislature. It is a right of which he can only be deprived by the judgment of the court for immoral or professional delinquency. The legislature may undoubtedly prescribe qualifications for the office, with which he must conform; as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life. But to constitute a qualification, the condition or thing prescribed must be attainable, in theory at least, by every one. That which, from the nature of things, or the past condition or conduct of the party, cannot be attained by every citizen, does not fall within the definition of the term. To all those by whom it is unattainable, it is a disqualification which operates as· a perpetual bar to the office. The question in this case is· not as to the power of congress to prescribe qualifications,·

but whether that power has been exercised as a means for the infliction of punishment against the prohibition of the constitution. That this result cannot be effected indirectly by a state, under the form of creating qualifications, we have held in the case of *Cummings* agt. *The State of Missouri*, and the reasoning upon which that conclusion was reached, applies equally to similar action on the part of congress. These views are further strengthened by a consideration of the effect of the pardon produced by the petitioner, and the nature of the pardoning power of the President. The constitution provides that the President shall have power to grant reprieves and pardons for offences against the United States, except in cases of impeachment. The power thus conferred are unlimited. With the exception stated, it extends to every offense known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment. This power of the President is not subject to legislative control.

Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him, cannot be fettered by any legislative restriction. Such being the case, the inquiry arises as to the effect and operation of a pardon. On this point all the authorities concur. A pardon reaches both the punishment prescribed for the offense, and the guilt of the offender; and when the pardon is full it releases the punishment, and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching. If granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights. It makes him, as it were, a new man, and gives him a new credit and capacity. There is only this limitation to its operation—it does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment.

In the matter of A. H. Garland.

The pardon produced by the petitioner is a full pardon for all offenses by him committed, arising from participation, direct or implied, in the rebellion, and is subject to certain conditions, which have been complied with. The effect of this pardon is to relieve the petitioner from all penalties and disabilities attached to the offense committed by his participation in the rebellion, so far as that offense is concerned. He is thus placed beyond the reach of punishment of any kind. But to exclude him by reason of that offense from continuing in the enjoyment of a previously acquired right, is to enforce a punishment for that offense, notwithstanding the pardon.

If such exclusion can be effected by the execution of an expurgatory oath, covering the offense, the pardon may be avoided, and that accomplished indirectly which cannot be reached by direct legislation. It is not within the constitutional power of congress thus to inflict a punishment beyond the reach of executive clemency.

From the petitioner, therefore, the oath required by the act of January 24, 1865, cannot be exacted, even were that act not subject to any other objection than the one just stated.

It follows from the views expressed, that the prayer of the petitioner must be granted. The case of *R. H. Marr*, is similar in its main features to that of the petitioner, and his petition must be granted, and the amendment to the second rule of the court, which requires the oath prescribed by the act of January 24, 1865, to be taken by attorneys and counsellors, having been unadvisedly adopted, must be rescinded, and it is so ordered.

Associate Justice MILLER delivered the *dissenting* opinion in the above cases. It was hoped the effect of the circumstances under which the law was passed would soon cease, in order that the statute might be repealed or modified. All good men looked for the return of better feelings between all sections, when the reason for the law would not exist; but the question now presented involved the exclusion from offices of public trust of those who engaged to destroy the

government by force. This could never fail to be one of profound interest. It is always delicate to say congress exercises powers not confided to it. In their action, members of congress are as much bound by oath to support the constitution, as the judges of the court.

The constitution makes ample provision for courts of justice to administer the laws and protect the rights of the citizens. Article 3, section 1, of the constitution, says the judicial power of the United States shall be vested in one supreme court, &c. Power is vested in the congress to fix the number of judges of the supreme court, fix their salaries, provide for all necessary officers, such as marshals, prosecuting attorneys, commissioners, jurors and bailiffs. By the act of 1789, commonly called the "judiciary act," it is enacted that parties may appear and manage their causes personally, or according to the rules. It is believed there is no civilized society in the world where there are not attorneys or practioners at law.

The enactment which has just been cited, recognizes the utility of this class of men. They are as essential to the working of the court as are marshals, sheriffs and other officers. As there is no instance of a court without a bar, the practice is a privilege on such conditions as the law-making power may prescribe. It is a privilege, and not an exclusive right. Every state in the union, and every civilized government on earth, have laws by which the right to practice depends upon professional skill and good moral character. The continuance of the right is made by law the continuance of these qualities. Attorneys are often deprived of the privilege, when it is discovered that they are of bad moral character. This is done by law, statutory or common, which is equally the expression of public will. Attorneys are subject to legislation, the same as judges. Congress has the power to prescribe the qualifications of attorneys, and prescribe oaths.

The act just declared unconstitutional, is nothing more than a law that attorneys shall take the same oath as other officers in civil or military life. This looks at their past and

In the matter of A. H. Garland.

future conduct, and all has reference to their overthrow of the government. They are required to answer that they are not guilty of treason in the past, and will give their allegiance to the government in the future. That true and loyal attachment to the government is made the qualification of attorneys, seems to be plain.

History shows members of the legal profession are powerful in the government, as they are the moulders of public sentiment, and they aid in the construction and enforcement of the law; and from among them judges are selected. To suffer treasonable sentiments unchecked, is to let the stream be poisoned at the source. If all the attorneys in the past had rendered faithful allegiance to the government, we should have been spared the horrors of the rebellion. If this qualification is so essential to a lawyer, it cannot be denied that the law was intended to secure that position.

The majority of the court, however, do not base their decision on a mere absence of authority to enact laws on the subject under consideration, but insist that the constitution prohibits the enactment of such laws, both by congress and the states; that the present law is in the nature of an *ex post facto* law, and that the provisions of the Misssouri constitution are in conflict with the constitution, for the same reason, and are, therefore, void.

First, in regard to bills of attainder, we must recur to bills of attainder passed by the British parliament, to enable us to arrive at a conclusion as to what was intended to be prohibited by the constitution. The word "attainder," is defined to be the corruption of the blood of the criminal capitally condemned, which takes place by the common law on sentence of death. The party attainted lost all power to receive or give by inheritance. This attaint or corruption of blood continued to be the law of England at the time our constitution was formed, and may be the law on condemnation of treason this day. Bills or acts of attainder declared persons attainted or blood corrupted, so as to lose heritable qualities.

Section second of the constitution declares the congress

shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attainted. He then explained at some length his views on this section, showing that the framers of our constitution struck boldly at despotic machinery, by prohibiting the passage of *ex post facto* laws and bills of attainder, with the exception which the constitution provided. It remained to be seen whether the law of congress and the Missouri constitution were brought within this class of bills. It is not claimed that the act works corruption of blood. Therefore, it is not a bill of attainder; nor did he see that it contains conviction of any designated persons.

It is true that acts were passed in Great Britain, against persons whose names were unknown, but the laws leave nothing but the names of the persons to be made out, and to prove their association with the crime committed. If not so, it would be a mere *brutum fulmen*, and punishment could be visited only by proof of the guilt. No person was pointed out by the act of congress, either by name or description. It is said that the law was made to apply to those engaged in the rebellion, but this is a mistake. It is applicable to all.

The act does not declare confiscation, nor does it pronounce sentence or inflict any punishment. It leaves the party himself to determine the act of guilt, or announce and pronounce his own sentence or innocence. It designates no name or guilt, and pronounces no sentence, and inflicts no punishment; therefore, it can in no sense be called a bill of attainder.

As to its being an *ex post facto* law, and a penal statute, it will be agreed it applies to criminal causes alone, and not to civil proceedings, which affect private rights respectively. Cases were cited in support of the argument, and the argument was continued to show that the law imposed a mere oath of office. There was nothing on its face to show it imposed an additional punishment for any other act. He maintained that the purpose of congress was to require loy-

In the matter of A. H. Garland.

alty as a condition to practice in the courts, and not as the majority maintain, a punishment for past offenses.

The President cannot, by pardon or otherwise, dispense with the law. The man guilty of counterfeiting, may be saved by the Ppresident from the gallows; but a lawyer cannot by him be readmitted to this bar. It remains for the legislative power to say to what extent relief shall be extended.

As to the opinion in the case of *Cummings*, pronounced to-day, Judge MILLER quoted Justice STORY, who said the whole power as to religion is left to the states, to be acted on in their own judgment; and in opposition to the views of the majority of the court, quoted an ordinance of the first municipality of New Orleans, which imposed a penalty on the priest of the Obituary chapel for performing service in the church of St. Augustine. The priest relied on the constitution of the United States to protect him; but the court replied, the constitution makes no provision to protect citizens of a state in their religious liberties. That was left to the state laws, and the case of *Pomali* was dismissed for the want of jurisdiction.

The constitution of Missouri says certain classes shall not exercise their functions unless they show their loyalty. This the majority holds to be unconstitutional, because the constitution forbids it. In this discussion he (Justice MILLER) had said nothing of the great evils inflicted on the country by the rebellion, nor of the consequent hardships, much more severe than any law.

He had merely endeavored to show what the law is, and Chief Justice CHASE, and Associate Justices SWAYNE and DAVIS, concurred in this opinion.