IN RE UNIFICATION OF THE MONTANA BAR ASSOCIATION.

(No. 7,903.)

(Submitted January 17, 1939. Decided February 8, 1939.)

[87 Pac. (2d) 172.]

560

*Messrs. Art F. Lamey, Walter Aitken, L. L. Callaway, George W. Farr, W. J. Jameson,* and *Julius J. Wuerthner,* acting in behalf of the Montana Bar Association, submitted a brief in support of the above petition.

*Messrs. Wellington D. Rankin* and *C. E. Pew* filed a motion to quash the petition.

*Mr. Philip O'Donnell* filed a demurrer to the petition and a brief in support thereof.

*Mr. Charles E. Avery* filed a brief in opposition to the petition.

*Messrs. Art F. Lamey, J. J. Wuerthner, L. L. Callaway, W. S. Hartman, W. R. Flachsenhar, L. L. Bulen, Ed. Burke, Jr., J. H. McAlear, Vincent Berquist, Robert L. Word, Jr., W. W. Wertz, Donald Nash* and *Walter Aitken,* made oral argument in support of the petition.

*Messrs. Lester Loble, W. E. Keeley, Chas. E. Pew, C. E. Baker, A. G. Shone, F. T. Hooks, Charles Avery, Jack Emigh, Stanley Foot, Frank K. Sullivan, Wellington D. Rankin* and *Phillip O'Donnell,* argued the matter orally in opposition to the granting of the petition.

*Mr. Edwin S. Booth, Sr.,* spoke on the subject generally, and *Mr. John W. Bonner,* a former president of the Montana Bar Association, stated that while he always had been in favor of a unified bar, he did not feel like committing himself as to whether or not the procedure before the court was a proper one.

Opinion: PER CURIAM.

Application was made to this court by the petition of certain of the members of the bar of the state, acting upon the advice

of and representing the State Bar Association, to adopt and promulgate rules for the "Unification and Integration of the Montana Bar." The court entertained the petition and caused notice thereof to be given to all admitted and practicing attorneys in the state, with the suggestion that opinions and arguments as to the legality and merits of the proposition be filed within a given time. Numerous attorneys availed themselves of the opportunity thus given to address themselves to the petition. Some of the responses were in the form of able and illuminating briefs.

Thereafter the matter was set for hearing on a day certain; whereupon the president of the State Bar Association and several other lawyers appeared and argued in support of the petition, and others appeared and argued in opposition thereto. The matter was then taken under advisement by the court. The subject covered by the arguments, both written and oral, took a wide range. Generally, however, they were directed to (1) the authority and powers of the court in such matters, and (2) the advisability and wisdom of adopting and promulgating the proposed rules.

The study of the general subject precipitated by the petition has been interesting and enlightening. The theories and principles which actuated the petition have not been and are not now local to this state. They have been given some consideration by lawyers all over the country for the past few years, and have been discussed and debated by bar associations and legal groups in most of the states. A considerable number of states have adopted some phase of the proposed plan. Some of the states have done so in the manner proposed in the petition. In many of the instances where this course was pursued, contests occurred as to the constitutionality of the rules adopted. Notably among the very able opinions on these matters are those of the supreme court of Missouri (*In re Richards,* 333 Mo. 907, 63 S. W. (2d) 672; *Clark* v. *Austin,* 340 Mo. 467, 101 S. W. (2d) 977), and Nebraska (*In re Integration of the State Bar,* 133 Neb. 283, 285, 275 N. W. 265, 114 A. L. R. 151). Other judicial opinions on related subjects are most enlightening and instructive. In addition to the opinions cited and others available, much has been

562

written on the subject by individual lawyers and jurists generally. Without assuming to review the subject or the history thereof comprehensively, or to apply the reasoning of any of the opinions too specifically to the matter now before us, we, nevertheless, have arrived at two conclusions; viz.:

This court, under and within the terms of our Constitution and the statutes of this state, has the power and authority to adopt, promulgate and enforce all necessary, proper and appropriate rules for its own government and for the admission and regulation of attorneys at law in the state of Montana. This the court has done from its inception. No substantial controversy has existed in the past, and none now exists, between this department and the other major departments of state. It will be time enough to consider any such contingency if and when it arises. The other coordinate departments have been generally free from attempts to impinge upon the rights, powers or prerogatives of this department, and the judicial department has consistently and uniformly avoided attempts to encroach upon the fields properly occupied by the other departments under the terms of a very clear and explicit Constitution.

The second proposition involves the necessity for and the wisdom of adopting and putting into effect the proposed rules and regulations. This involves, to some extent, consideration of the success or failure of the rules already in effect. If the present rules are satisfactory and efficient, if under them a fair measure of beneficial results has been achieved and enjoyed, the need for change cannot be said to be imperative. If, on the other hand, our system and rules have become outmoded and are no longer suited to our needs, or adequate for our purposes, the necessity for the new or proposed rules should be obvious to anyone familiar with the facts.

The rules now in effect are the result of trial and error. They were not all adopted at one time, or put into effect upon conjecture. They were involved from experience as judged, appraised and applied by a long line of able, efficient and brilliant lawyers and jurists. We hesitate to sweep them all aside and consign them to the wastebasket in order to replace them with

other and different rules, modern and progressive though they may seem.

The present members of this court have a larger measure of pride in the record and standing of the court as accomplished and written into our judicial history by the many able men who have served upon it, than they can possibly have in their own ability and wisdom. That being so, we hesitate to say that we can in a new set of rules to be formulated and promulgated at this time sufficiently improve the situation in Montana to justify the experiment. Admittedly, the proposed plan carries with it many features that are comparatively new and have not yet been tried sufficiently entirely to demonstrate their worth and their advantage over the existing rules.

More important still, we do not feel that as yet there has been a sufficient showing to demonstrate the necessity for the immediate abandonment of our existing rules in favor of some other system. The lawyers of the state have not spoken in impressive enough numbers to convince us that the time is at hand when such measures are justified. We know of no abuses of serious character existing under the present system that would certainly be remedied or even substantially improved under the new rules. Perhaps that is the reason that there has not been a more general demand for the changes by the members of the bar at large.

We are not antagonistic or opposed to changes when such are manifestly wise and necessary. In the evolution of events, or upon a more impressive showing, a similar petition might bring a different response. At this time we do not deem that the exigencies of our situation dictate a favorable response to the petition, and it is accordingly denied.

Mr. Justice Morris:

I dissent. The majority opinion considers the petition before us under two headings. Under the first, that the court has the power to proceed to a unification of the bar along the lines of the petition is practically admitted, but doubt is expressed as to the advisability of exercising the power for various rea-

sons, but the bar is not a unit on this phase of the matter. If our Constitution has vested certain powers in this court in preference to placing them in another department of the government, it would appear rather obvious that we are shirking an obligation by shifting the burden to other shoulders. Any conflict between the judiciary and the legislature is extremely improbable. Both have certain powers over the bar of the state and there is nothing in the past to indicate that either would wilfully encroach upon the prerogatives of the other.

Section 1 of Article IV of our Constitution provides: "The powers of the government of this state are divided into three distinct departments: The legislative, executive, and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

Section 1 of Article VIII of the same document provides: "The judicial power of the state shall be vested in the senate sitting as a court of impeachment, in a supreme court, district courts, justices of the peace, and such other inferior courts as the legislative assembly may establish in any incorporated city or town."

The Constitution does not by express grant vest the power to define and regulate the practice of law, and that power must be exercised by the department of government into which it naturally belongs. The Nebraska court of last resort, in considering a like question under similar constitutional provisions, in the case of *In re Integration of the State Bar,* 133 Neb. 283, 275 N. W. 265, 114 A. L. R. 151, quoted with approval apt language used by the Missouri court in like circumstances, in the case of *In re Richards,* 333 Mo. 907, 63 S. W. (2d) 672, as follows: "All governmental powers are in their nature either legislative, executive, or judicial. The Constitution does not undertake to define what acts fall within the one class or the other, but leaves every act to be classified according to its nature, recognizing that the essentials which distinguish those that

belong to one department from those that belong to the two others are discernible to the learned mind. But in that article of the constitution all of the powers of the state government are disposed of, and every one who lawfully exercises any state governmental function is able to trace the source of his authority to one of the three departments there named. The power, whatever its character, can be exercised only by or under authority of the separate magistracy to which by the constitution it is assigned.''

The right to practice law is not an absolute property right but is a mere privilege subject to reasonable regulation. (*In re Bailey,* 50 Mont. 365, 146 Pac. 1101, Ann. Cas. 1917B, 1198.) The admission of an applicant to practice law is a judicial act to be performed only by the court. (*State ex rel. Freebourn* v. *Merchants' Credit Service, Inc.,* 104 Mont. 76, 66 Pac. (2d) 337; *In re Hansen,* 101 Mont. 490, 54 Pac. (2d) 882.) This court has the power to define what constitutes the practice of law (*In re Bailey,* supra; *In re White,* 54 Mont. 476, 171 Pac. 759), the power to prevent laymen from illegally practicing law (*State ex rel. Freebourn* v. *Merchants' Credit Service, Inc.,* supra), the power to disbar or suspend from practice. (*In re Young,* 77 Mont. 332, 250 Pac. 957.) The power of the court over the members of its bar is inherent, over and above any statutory provisions. (*In re Hansen,* supra.)

The supreme court of Nebraska, in the case of *In re Integration of the State Bar,* supra, said of the inherent power of the court:

''The inherent power of this court which petitioners ask us to invoke has always existed. This power is not subject to delegation to committees and representatives, although these agencies may be utilized for investigation or fact-finding purposes and to make recommendations, but the final decision must rest with the court.

''The primary duty of courts is the proper and efficient administration of justice. Attorneys are officers of the court and the authorities holding them to be such are legion. They are in effect an important part of the judicial system of this state.

It is their duty honestly and ably to aid the courts in securing an efficient administration of justice. The practice of law is so intimately connected and bound up with the exercise of judicial power in the administration of justice that the right to define and regulate its practice naturally and logically belongs to the judicial department of our state government.'' Other well reasoned cases hold that the defining and regulation of the practice of law is inherent in the courts, among which are: *Commwealth ex rel. Ward* v. *Harrington*, 266 Ky. 41, 98 S. W. (2d) 53; *Clark* v. *Austin*, 340 Mo. 467, 101 S. W. (2d) 977; *People ex rel. Chicago Bar Assn.* v. *Goodman*, 366 Ill. 346, 8 N. E. (2d) 941, 111 A. L. R. 1.

But it is said the legislature has assumed to regulate the practice of law by providing who may be admitted (sec. 8936, Rev. Codes), for qualifications, examination and admission of applicants (sec. 8937), for admission of attorneys from other states (sec. 8940), for causes for disbarment of attorneys (sec. 8961), for the manner of proceeding upon complaint against attorneys (secs. 8951 to 8954, incl.), for defining what constitutes the practice of law (sec. 8944, and other similar sections), all of which statutes have been in force for many years and have received the sanction of the courts as is illustrated by consulting the various decisions of this court, among which are many of those cited supra. The argument proceeds along the line that the legislature having assumed to regulate this field of the law, an unseemly clash between the coordinate departments of the state government will ensue; also by the adoption of the proposed rules these statutes will be repealed or abrogated. The contention is answered, I think, most effectively by the special concurring opinion of the Chief Justice, concurred in by a majority of the court, in the Missouri case of *Clark* v. *Austin*, supra, discussing the effect of similar statutes where the court had assumed to make rules under its inherent power after an elaborate and exhaustive review of the authorities, as follows:

''The legislative department may enact statutes regulating the legal profession or business as it does other professions and businesses. Such statutes * * * are enacted through an

exercise of the police power. * * * It is the inherent power to protect their own existence and functioning as constitutional courts, which includes the right to regulate the practice of law. They can make rules on that subject when there are no statutes, or supplementing statutes and imposing additional regulations. And they can strike down, as unconstitutionally usurping judicial power, any statute unreasonably encroaching upon, and therefore frustrating, their right to protect themselves. * * * But it does not follow that the courts have the exclusive power to regulate the practice of law or that they recognize legislation on that subject only out of comity. So far as is necessary to their self-protection the right of the courts is paramount or exclusive; but beyond that point the legislative department also has constitutional rights in the exercise of the police power. * * * The ultimate objective of both departments may be the same—the good of all of the people in the administration of justice; but the powers are fundamentally different. The courts' power essentially is protective and self-serving; the legislative power is to advance the public welfare.''

Our Constitution, section 9, Article XV, like that of Missouri, provides that the police power shall never be abridged, which was the basis of the decision of that court. The proposed rules are supplementary to the existing statutes and would not, therefore, operate to repeal any reasonable regulatory statutes.

In the second division of the majority opinion grave doubt is expressed as to the wisdom of sweeping aside the rules under which many well known lawyers of the Montana bar gained marked distinction, and supplant the old with the new and untried. Similar misgivings are inevitably brought forward in opposition to any new or progressive movements in all human activity. It is the part of wisdom to abandon the old for the new only after careful consideration, but when the new gives promise of greater service to society than the old, we should have the courage to put the new to the test, otherwise the hope of progress remains bound to inaction.

It appears to me that the principal opposition to unification or integration of the Montana bar springs from lack of in-

formation as to what may be done and intended to be done under such unification. At the hearing before the court many expressions were given voice about the arbitrary practices that might arise. To me it appears that in bringing the members of the bar and bench into a unit organization we take a leaf from the book of rules of the boy scouts, or the practice followed in many high schools where the scouts or pupils as a whole are put on their honor and the body made responsible for the acts of the individuals, and the discipline prescribed by the organization. Applied to the Montana bar, the bar itself would be depended upon to discipline its members, but any arbitrary action by the bar as a whole, in dealing with any member could not become effective until reviewed by this court, and while causes for suspension from practice and disbarment could be investigated and evidence accumulated by the bar or a committee appointed for that purpose, no final action on disbarment or suspension could be made effective until reviewed by this court. The power of disbarment and suspension is now vested in this court and no new power would be vested elsewhere relative to such matters, but the initiative in all disciplinary matters would be in the bar, while it is now in this court. No ethical lawyer has any reasonable grounds for fear that any right to which he is entitled to exercise will be circumscribed by the proposed new order. But the fact is that many unethical members have stooped to practices that bring reproach upon the entire bar. In an address before the state bar of West Virginia in 1936 the president of that organization said:

"Whether the lawyers believe it or not, whether they have accepted the post or not, the public has put into their hands the administration of law. Our bar committees on grievances, state and local, know only too well that many lawyers have failed in their trusts. As individuals, we know of cases which have never reached such committees. The complaints made by individuals and the public include the following: We charge too large fees; we have not sufficiently speeded up the determination of trials; we countenance delays by opposing counsel at the sacrifice of our client's interest; we want to be brilliant and

clever and free a client whose guilt is beyond question; we bring suits against large corporations relying upon prejudice to secure a large judgment when our client is entitled to little or nothing; we settle a good case for less than it is worth to be rid of work and worry; we hesitate to prefer charges against a fellow practitioner and permit him to go on in the practice of the profession endangering the life, liberty and property of other people who are not in the position to know the character of the lawyer they may select to represent them. The public believes that we are guilty of imposing upon the poor, of soaking the rich, of taking advantage of technicalities to free the guilty, and generally failing to see that the law is properly administered.''

That courts and lawyers have been the subject of public criticism is a matter of common knowledge. The press and leading publications voice this sentiment. Much of the criticism which has been heaped upon the bar is unwarranted. To a large extent the integrity and high character of the bar is overlooked or ignored by the public. That a few unethical lawyers have degraded the public esteem of the bar as a whole is a fact well known to every lawyer. The attitude of the public toward the bar is based on the belief that the bar could purge itself but that it is unwilling to do so. Persons who are not lawyers have attempted to practice law in a more or less limited degree to the detriment of the public as well as the administration of justice. In the past reliance in the main has been placed in a voluntary bar association to adopt and pursue corrective measures.

The public has long complained of the delays in the administration of justice by the courts, and has laid the blame at the door of the members of the bar. As a result of this situation arbitration of matters in dispute has been resorted to, and many administrative boards or bodies have been created to determine certain rights of governments and individuals, all of which could more properly be decided by courts. A proper system of courts is the foundation of our system of government; neither can long endure without the other.

Voluntary bar associations have long known and appreciated their inability properly to secure the needed regulation of the practice of law. They have appealed to the legislature and in some states the response was the integration of the bar by legislative Act, while in others merely the sanction of the integration of the bar by the courts was given. The voluntary association in this state has made a number of attempts to secure the integration of the bar, or its sanction by the legislative department, without success. Other states, as I have noted supra, have secured the integration of their bar through the adoption of rules of court. The need being present for the betterment of the administration of justice through the proper regulation of the practice of law, it would seem fitting and proper that the department of government which is charged with the duty of administering justice should itself adopt a tried and tested remedy.

Under the suggested plan, it can be accomplished without invoking any power not already exercised in the past, and without the delegation of any judicial function to any agency of the bar. The matter of the admission, suspension, disciplining and disbarment of attorneys, as well as the regulation of the practice of law, rests in this court. In the event of the adoption of this plan, if it be found that new evils arise or old ones continue, they may be corrected by appropriate amendments to the rules, or the entire plan discarded if experience has demonstrated such action to be the wise course to pursue. Progress can only be accomplished through changes, the desirability of which can only be determined after trial. Some twenty-two of our sister states have adopted this plan where it has been in operation for a number of years, in one or more far in excess of fifteen years. None of them have yet rejected the plan after trial. These reasons impel me to the belief that the prayer of the petition should be granted.