324 So.2d 256

**BOARD OF COM'RS OF the ALABAMA STATE BAR**

v.

**STATE ex rel. William J. BAXLEY, Attorney General, et al.**

**SC 1207.**

Supreme Court of Alabama.

Dec. 4, 1975.

Rehearing Denied Jan. 9, 1976.

M. R. Nachman, Jr., William H. Morrow, Jr., Montgomery, for appellant.

William J. Baxley, Atty. Gen. and Winston T. Lett, and Jerry L. Weidler, Asst. Attys. Gen., for the State, appellee.

SHORES, Justice.

The attorney general filed a bill for declaratory judgment against the Board of Commissioners of the Alabama State Bar (hereinafter Board) for a determination that Act No. 750, Acts of Alabama 1973, Regular Session, page 1123, approved August 30, 1973, is constitutional; that the Board be required to comply with the act; and that Rule IV(D) of the Rules Governing Admission to the Bar of Alabama is unconstitutional. Act No. 750 provides in part:

"Section 1. Any rule, regulation or law limiting the number of times that any person, otherwise qualified may apply for and stand the Alabama Bar Examination at any regular examination session is hereby prohibited. However, no applicant may take the examination more than three (3) times in any three (3) year period."

Since 1934, the Board of Commissioners of the Alabama State Bar has followed the practice of limiting to three the number of times one may sit for the bar examination. Rule IV(D), as it now exists, was passed by the Commissioners on July 22, 1961, and provides:

"No applicant shall be permitted to take the examination, under these rules,

more than three times unless subsequent applications by such applicant are approved by the Board of Commissioners of the Alabama State Bar."

The complaint was dismissed for lack of an actual controversy of justiciable character and because of a lack of jurisdiction over the subject matter. Subsequently, two persons were allowed to intervene who had failed the bar examination three times and were not allowed to take it for a fourth time under the provisions of Act No. 750.

The trial court observed the long history of legislative enactments governing admission to the bar and the lack of any standards adopted by the courts of Alabama and concluded that Act No. 750 was constitutional. From this judgment the Board appealed.

It is the contention of the Attorney General and intervenors that the legislature may exercise regulation over bar examinations if such regulation does not impair the judicial branch's exercise of its inherent functions; that the legislature has done so for over fifty years; that the judiciary has acquiesced in such regulation; and that the Board is a legislatively created authority and not an arm of the Supreme Court.

The Board submits that Act No. 750 violates Sections 42 and 43 of the Alabama Constitution as an attempted exercise by the legislature of judicial functions and as an invasion of the inherent powers of the judiciary; that the legislature may establish only minimum standards for the practice of law; that the Board is an arm of the Supreme Court and its standards for admission are court-made rules. It also argues that Act No. 750 is unconstitutionally vague, uncertain, arbitrary, and capricious.

The single issue presented by this appeal is whether establishing rules governing admission to the bar is a judicial function and, if so, is the legislature, by Act No. 750, exercising a judicial function in violation of the admonitions and prohibitions contained in Sections 42 and 43 of the Constitution of 1901.

These sections of the Constitution provide in part:

"Section 42. The powers of the government of the State of Alabama shall be divided into three distinct departments . . . legislative . . . executive . . . judicial . . . ."

"Section 43. In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them . . . ."

The Board of Commissioners of the Alabama State Bar was created by Act No. 133, General Acts of Alabama 1923, page 100, approved August 9, 1923 (Code of Alabama 1940, Title 46, § 21). This act was found by this court to be constitutional in *Ex parte Thompson*, 228 Ala. 113, 152 So. 229 (1933). In that case, this court looked to Section 139 of the Alabama Constitution,[1] which provided:

"The judicial power of the state shall be vested in the senate sitting as a court of impeachment, a supreme court, circuit courts, chancery courts, courts of probate, such courts of law and equity inferior to the supreme court, and to consist of not more than five members, as the legislature from time to time may establish, *and such persons as may be by law invested with powers of a judicial nature* . . . ." (Emphasis added)

The court recognized that the powers conferred on the Board were judicial in character, but concluded that under Section

1. Section 139 of the Constitution of 1901 has now been superseded by Amendment 328 to the Constitution of 1901—proclaimed ratified December 28, 1973. (See specifically Article VI, § 6.01(a) and (b).)

139 of the Constitution there was express authority for creating the Board and conferring on it judicial functions. However, the court noted that ". . . the rules and regulations which may be formulated and adopted by the board shall not become effective until the same *shall have received the approval of this court,* and *the right of this court to approve or disapprove* all or any part of the rules so formulated and adopted by the board *is fully reserved to this court.* . . ." (Emphasis Added) *Ex parte Thompson,* supra, at 124–25, 152 So. at 238. And in this same opinion, at page 126, 52 So. at page 240, referring to this court's power and responsibility to admit and disbar attorneys, the court said "'. . . This inherent power of the court cannot be defeated by the legislative or executive department. . . .'"

█ It is true that this court has recognized legislative power to prescribe minimum requirements for admission to the bar so long as they do not interfere with the inherent power of the court to determine who shall practice before it. *Ex parte Dozier,* 262 Ala. 197, 77 So.2d 903 (1955). But the fact that this court has not been as active in formulating rules governing *admission* to the bar (as it has in adopting rules governing the practice of law) but rather has left this function largely to the Board of Bar Commissioners, acting on its behalf, does not mean that it has abrogated its authority and responsibility to the legislature, if in fact such power is inherent to the judiciary. In fact, it cannot relinquish its authority to another branch of government under the express provisions of the constitution of this state.

The Supreme Court of Georgia, responding to a charge similar to the one made here, that judicial acquiescence in legislative activity in this area has diluted the court's inherent power, said that judicial recognition of such legislative acts did ". . . not mean that this court intended to, or even could, relinquish this judicial responsibility to the legislature." *Wallace*

*v. Wallace,* 225 Ga. 102, 111–12, 166 S.E.2d 718, 724 (1969).

This brings us to the question of whether regulation of admission to the bar is an "inherent" power of the judiciary. It has been said that "What constitutes judicial power, within the meaning of the constitution, is to be determined in the light of the common law and of the history of our institutions as they existed anterior to and at the time of the adoption of the constitution." *State v. Harmon,* 31 Ohio St. 250, 258 (1877).

A brief examination of the common-law history of regulating admissions to the bar and the practice of law reveals a division of responsibilities in the English legal profession. In the early days of the profession there was the "attorney," who served as a substitute for the litigant and the "advocate" or "barrister" who supported one's ". . . cause by his learning, ingenuity and zeal." 2 W. Holdsworth, A History of English Law 311 (4th ed. 1936). In 1292, Edward I decreed that admissions to the profession should be regulated and delegated to his justices the task of appointing as attorneys those with sufficient learning and skill. Rolls of Parliament, i. 84, cited in Vol. I, F. Pollock & F. W. Maitland, The History of English Law 216, n. 2 (2d ed. 1898).

By 1403, the increasing number of attorneys forced Henry IV to order his justices to examine all attorneys and put on the roll only those with good character and sufficient learning. 4 Henry IV, c. 18. See also Lee, The Constitutional Power of the Courts Over Admission to the Bar, 13 Harv.L.Rev. 233 (1899). The courts also issued orders regulating the conduct of the profession as evidenced by orders issued in 1452. Praxis Utriusque Banci 26, cited in 2 W. Holdsworth, A History of English Law 505, n. 3 (4th ed. 1936). While Parliament legislated in this regard with respect to the numbers to be allowed admission as attorneys, Parliament did not attempt to determine the amount of learning

or qualifications to be required of an attorney.

The barristers were also subject to court control, though some argue only indirectly. See Comment, Admission to the Bar and the Separation of Powers, 7 Utah L.Rev. 82 (1960-61). The barristers came from educational societies called the Inns of Court. The barrister's call to the bar came from the Inns of Court; however, if the Inns refused to call a person to the bar, the remedy was an appeal to the judges. Lee, The Constitutional Powers of the Courts Over Admission to the Bar, supra, at 240.

Additionally, the judges regulated the number of students admissible to the Inns —and thus the number admissible to the bar—the course of study, and even morals and mode of dress. See Note, Legislative or Judicial Control of Attorneys, 8 Fordham L.Rev. 103, 104 (1939): Indeed, there is speculation that the Inns were developed through the efforts of judges and serjeants to improve the profession. Holdsworth, supra, at 496.

It has been observed "The English courts from time to time, by virtue of their own rules, without any legislation, regulated the admission and disbarment of attorneys." Lee, The Constitutional Power of the Courts Over Admission to the Bar, supra, at 244.

Various rules adopted from 1573 to 1704 can be found in Maugham on Attorneys, 15-20, App. XIV–XX (1825). Lee, supra, at 244. Parliament legislated upon the subject, but the legislation was to exclude the unfit. The statutes always recognized the admission of attorneys as a matter of judicial discretion. Lee, supra, quoting Maugham, Attorneys and Solicitors 9 (1825).

It thus appears that ". . . although the profession had its origin and mature development in a country where constitutional divisions of government were unknown, its supervision and control at every stage were handed over to the judges, until by long continued use they came to constitute recognized prerogatives belonging to the judiciary. . . ." Green, The Courts' Power Over Admission and Disbarment, 4 Tex.L.Rev. 1, 7 (1925).

It is clear, therefore, that for several centuries, the English considered the regulation of admission to practice before the courts to be a judicial function, exercisable only by the courts.

In this country, unlike England, it is a characteristic of both the national and state governments to divide governmental functions into three distinct, separate and equal branches. One cannot read The Federalist papers without being struck with the concern and attention which the framers of our constitution devoted to the principle of separation of powers. It was agreed by all " . . . that the legislative, executive, and judiciary departments ought to be separate and distinct." The Federalist No. 47 (J. Madison).

Thomas Jefferson believed that concentrating the powers of the three departments in the same hands was ". . . precisely the definition of despotic government." (Notes on the State of Virginia, p. 195, quoted in The Federalist No. 48 (J. Madison). He said that that was not the form of government for which this country fought but rather ". . . one which should not only be founded on free principles, but in which the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others. For this reason, that convention which passed the ordinance of government, laid its foundation on this basis, that the legislative, executive and judiciary departments should be separate and distinct . . . ."

In commenting on Jefferson's draft of a constitution for Virginia, which like Alaba-

ma's, contains a provision for separation of powers, the author of The Federalist No. 49 (Hamilton or Madison) said:

"The plan [for three equal but separate branches of government] . . . marks a turn of thinking, original, comprehensive, and accurate; and is the more worthy of attention as it equally displays a *fervent attachment to republican* government and an enlightened view of the dangerous propensities which it ought to be guarded. . . ."

Unquestionably, the establishment of three separate but equal and independent branches of government was considered by the writers of the American Constitution as essential to a republican form of government, guaranteed to the states by Article IV, Section 4. One writer has said that there are four essential characteristics of a republican form of government.

1) The existence of the ultimate sovereignty in the body politic;

2) The expression of the popular will by the method of representation;

3) Subservience of the entire group to the will of the majority; and

4) The independency of the executive, legislative, and judicial departments of government. Ingham, Republic in Form, 34 Dickinson L.Rev. 193 (1930).

The framers of the Constitution of the United States believed that the real danger in disturbing the system of checks and balances provided for in the separation of the government into three equal branches was the danger of changing the form of government to something other than the republican form. This division of power, and the system of checks and balances inherent in it, is said to be America's chief contribution to the science of government.

*State v. Fulton,* 99 Ohio St. 168, 124 N.E. 172 (1919). The Supreme Court of the United States, speaking through Justice Miller in *Kilbourn v. Thompson,* 103 U.S. (13 Otto) 168, 190, 26 L.Ed. 377 (1880), said on the subject:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. . . ."

Does regulation of admission to practice law fall within the judicial function? In *Ex parte Secombe,* 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1856), the Supreme Court found it to be ". . . well settled . . . that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed. . . ."

In *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), the Supreme Court was careful to note that admission to the bar ". . . is not . . . a mere ministerial power. It is the exercise of judicial power, and has been so held in numerous cases. . . ." (71 U.S. (4 Wall.) at 378–79).

"'The practice of law is so intimately connected with the exercise of judicial power in the administration of justice that the right to define and regulate the practice naturally and logically belongs to the judicial department of state government.' . . ." *Rowen v. LeMars Mut. Ins. Co. of Iowa,* 230 N.W.2d 905, 914 (Iowa 1975).

In every state of the union the judiciary exercises regulatory control in admissions to the bar.[2]

2. 1. Alabama—*In re Sullivan,* 283 Ala. 514, 219 So.2d 346 (1969);
2. Alaska—*Application of Houston,* 378 P.2d 644 (Alas.1963);

3. Arkansas—*McKenzie v. Burris,* 255 Ark. 330, 500 S.W.2d 357 (1973);
4. Arizona—*In re Bailey,* 30 Ariz. 407, 248 P. 29 (1926);

Act No. 750, attempting as it does, to remove standards for admission to the bar established by the Board of Bar Commissioners of the Alabama State Bar, acting as an arm of this court, is an effort to perform a judicial function in contravention of Section 43 of the state constitution. This act, unlike Act No. 133 creating the Board of Bar Commissioners found constitutional by this court in *Ex parte Thompson,* supra, does not invest "persons" with "powers of a judicial nature" as permitted by Section 139 of the Constitution, but instead is an effort by the legislature itself to exercise powers of a judicial nature. This act is not, as the attorney general claims, merely " . . . amendatory legislation to the statutes creating the Board to further define its regulatory and administrative duties." The act is in direct conflict with Rule IV(D) promulgated by the Board in aid of this court and, as such, is

5. California—*Brydonjack v. State Bar of California,* 208 Cal. 439, 281 P. 1018 (1929) ;
6. Colorado—*In re Bar Association,* 137 Colo. 357, 325 P.2d 932 (1958) ;
7. Connecticut—*Heiberger v. Clark,* 148 Conn. 177, 169 A.2d 652 (1961) ;
8. Delaware—*In re Member of Bar,* 257 A. 2d 382 (Del.Supr.1969) ;
9. Florida—*Fuller v. Watts,* 74 So.2d 676 (Fla.1954) ;
10. Georgia—*Wallace v. Wallace,* 225 Ga. 102, 166 S.E.2d 718 (1969) ;
11. Hawaii—*In re Integration of Bar of Hawaii,* 50 Hawaii 107. 432 P.2d 887 (1967) ;
12. Idaho—*Application of Kaufman,* 69 Idaho 297, 206 P.2d 528 (1949) ;
13. Illinois—*In re Anastaplo,* 3 Ill.2d 471, 121 N.E.2d 826 (1954) ;
14. Indiana—*State v. Moritz,* 244 Ind. 156, 191 N.E.2d 21 (1963) ;
15. Iowa—*Rowen v. LeMars Mut. Ins. Co. of Iowa,* 230 N.W.2d 905 (Iowa 1975) ;
16. Kansas—*State v. Schumacher,* 214 Kan. 1, 519 P.2d 1116 (1974) ;
17. Kentucky—Ky.Rev.Stat., Tit. 4, § 30.030;
18. Louisiana—*Ex parte Steckler,* 179 La. 410, 154 So. 41 (1934) ;
19. Maine—*Application of Feingold,* 296 A.2d 492 (Maine 1972) ;
20. Maryland—*Public Serv. Commission v. Hahn Transportation, Inc.,* 253 Md. 571, 253 A.2d 845 (1969) ;
21. Massachusetts—*Collins v. Godfrey,* 324 Mass. 574, 87 N.E.2d 838 (1949) ;
22. Michigan—*Ayres v. Hadaway,* 303 Mich. 589, 6 N.W.2d 905 (1942) ;
23. Minnesota—*Sharood v. Hatfield,* 296 Minn. 416, 210 N.W.2d 275 (1973) ;
24. Mississippi—*Mississippi State Bar v. Collins,* 214 Miss. 782, 59 So.2d 351 (1952) ;
25. Missouri—*Clark v. Austin,* 340 Mo. 467, 101 S.W.2d 977 (1936) ;
26. Montana—*In re Unification of Montana Bar Ass'n,* 107 Mont. 559, 87 P.2d 172 (1939) ;
27. Nebraska—*State ex rel. Ralston v. Turner,* 141 Neb. 556, 4 N.W.2d 302 (1942) ;

28. Nevada—*Petition of Batten,* 83 Nev. 265, 428 P.2d 195 (1967) ;
29. New Hampshire—*Harrington's Case,* 100 N.H. 243, 123 A.2d 396 (1956) ;
30. New Jersey—*New Jersey State Bar Ass'n v. Northern N. J. Mtg. Asso.,* 32 N.J. 430, 161 A.2d 257 (1960) ;
31. New Mexico—*Application of Sedillo,* 66 N.M. 267, 347 P.2d 162 (1959) ;
32. New York—N. Y. Const., Art. 3, § 531 (1938) ;
33. North Carolina—Gen.Stat. of N.C., Tit. 84, § 84–23; § 84–36 (1975) ;
34. North Dakota—N.D.Stat., Tit. 27, § 27–11–02 (1960) ;
35. Ohio—*Judd v. City Trust & Savings Bank,* 133 Ohio St. 81, 12 N.E.2d 288 (1938) ;
36. Oklahoma—*Re Bledsoe,* 186 Okl. 264, 97 P.2d 556 (1939) ;
37. Oregon—*In re Crum,* 103 Or. 296, 204 P. 948 (1922) ;
38. Pennsylvania—*In re Olmsted,* 292 Pa. 96, 140 A. 634 (1928) ;
39. Rhode Island—*Creditors' Serv. Corp. v. Cummings,* 57 R.I. 291, 190 A. 2 (1937) ;
40. South Carolina—Code of S.C., Tit. 56, § 56–96 (1972) ;
41. South Dakota—*In re Hosford,* 62 S.D. 374, 252 N.W. 843 (1934) ;
42. Tennessee—*Cantor v. Brading,* 494 S. W.2d 139 (Tenn.1973) ;
43. Texas—*Burns v. State,* 76 S.W.2d 172 (Tex.Civ.App.1934) ;
44. Vermont—*Taft v. Taft,* 82 Vt. 64, 71 A. 831 (1909) ;
45. Utah—*Nelson v. Smith,* 107 Utah 382, 154 P.2d 634 (1944) ;
46. Virginia—Code of Va., Tit. 54, § 48 (1950) ;
47. Washington—*In re Bruen,* 102 Wash. 472, 172 P. 1152 (1918) ;
48. West Virginia—*West Virginia State Bar v. Earley,* 144 W.Va. 504, 109 S.E.2d 420 (1959) ;
49. Wisconsin—*In re Cannon,* 206 Wis. 374, 240 N.W. 441 (1932) ;
50. Wyoming—Wyoming Stat., Tit. 33, § 40 (1967).

a direct encroachment upon the undisputed inherent power of this court to determine who shall practice before it. Act No. 750 removes minimum standards established by the Board as an arm of this court.

■ We have repeatedly held, as recently as April 10, 1975, in *Simpson v. Alabama State Bar,* 294 Ala. 52, 311 So.2d 307, 309:

"... The Board was created in aid of this court, which has the inherent jurisdiction to admit attorneys to the practice of law and to suspend or disbar them. ..."

Although the Board was created by the legislature, it was created as an arm to this court and any action by the Board is subject to review or approval by this court. The legislature has not created an entity which is not subject to control or regulation, the Board is subject to the control of this court. Act No. 750 would dilute that control, and hence invades the judicial sphere.

"... Each department, in our beautiful system of government, has its own appropriate sphere, and so long as it confines itself to its own orbit the machinery of government moves without friction." *Petition of Splane,* 123 Pa.St. 527, 540, 16 A. 481, 483 (1889).

This court is compelled, under our system of government, to guard against such encroachments by one branch of government into the sphere reserved to another equal branch. We hold, therefore, that Act No. 750 violates Sections 42 and 43 of the Constitution of 1901.

The intervenors and the attorney general point out, and it is not contested by the Board, that Rule IV(D) is not absolute, as it now stands, and provides for examinations in excess of three upon approval by the Board. The record shows that in the past ten years three applicants have been permitted to take the bar examination more than three times, upon a showing of "ex-

traordinary, mitigating circumstances." Of these three, only one applicant passed the examination. The intervenors complain of the absence of a specific written rule spelling out what constitutes "extraordinary, mitigating circumstances."

Approximately two-thirds of the states in this country provide for a limited number of times which an applicant may stand for the bar examination. Many provide for three times, as does Alabama. Some of these states, in allowing an additional attempt, require approval of the various boards, some require approval of the Supreme Court, and some require the passage of time between the last permitted attempt and any subsequent one which may be allowed. Many require a showing of additional study as a condition to applying for permission to take the examination in excess of the times permitted.

■ We are in agreement with the intervenors that, whatever standards are used to determine whether an applicant should be allowed to take the examination in excess of three times, those standards must comport with equal protection and due process safeguards. The Supreme Court of the United States has said, "We recognize the importance of leaving States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner ..." *Konigsberg v. State Bar of California,* 353 U.S. 252, 273, 77 S.Ct. 722, 733, 1 L.Ed.2d 810 (1957).

■ However, these intervenors have not shown that the Board has acted arbitrarily or discriminatorily in denying them permission to take the bar examination in excess of three times, nor have they shown any extraordinary or mitigating circumstances which would bring them within the existing criteria, as general as it is. They base their application to take the examination a fourth time squarely upon Act No. 750. That act is in violation of the Constitution of Alabama. Therefore, the inter-

venors must, if they wish to persist in their efforts to gain permission to stand for the bar another time, show that some mitigating circumstances exist which are sufficient to persuade the Board, acting without capriciousness or discrimination, to permit them, or either of them, an additional examination.

■ The Board, should the intervenors or either of them apply for permission to take the bar examination another time, must determine upon the facts of each case, whether either or both intervenors have shown sufficient, extraordinary or mitigating circumstances as to indicate that circumstances existed at the last three examinations as to make it unlikely that the applicant(s) has been fairly tested as to his competency to practice law in this state, or whether subsequently the applicant(s) has acquired additional training which would render him more likely to be successful in a fourth effort to meet the requirements for admission to the bar of this state, or other good and valid reasons.

The judgment appealed from is reversed and one is here rendered in favor of appellant.

Reversed and rendered.

HEFLIN, C. J., and MERRILL, BLOODWORTH, FAULKNER, JONES, ALMON and EMBRY, JJ., concur.

MADDOX, J., concurs specially.

MADDOX, Justice (concurring specially.)

I concur specifically in that portion of the majority opinion which holds that this Court has the inherent power to govern admission to the Bar.

By concurring specially, however, I do not wish to be understood as saying that I believe that the policy expressed by the legislature of allowing an applicant to take the examination more than three times is necessarily unreasonable. The applicants here, however, do bottom their right to take the examination the fourth time solely on the provisions of Act 750, and the Act does, in fact, conflict with the Bar rule. Consequently, it is my opinion that this Court must ultimately determine whether the Bar rule, or its application, denies an applicant equal protection of the laws or due process.

If the majority opinion denied the applicants the right to continue to show themselves qualified to practice law, I would have to disagree with that conclusion. But since the applicants are given an opportunity to apply again to take the examination, the way is still open for them to test not only the rule, but also its application in their individual cases, and it is my own personal opinion that if they are rejected, they may then petition this Court to review the matter in the same manner in which we review disciplinary proceedings. Cf. *Ex parte Weinberg,* 281 Ala. 200, 201 So. 2d 38 (1967).

Another reason why I concur specially is that I believe that the new Judicial Article, (Amendment 328, Constitution of Alabama, 1901, carried as Article VI in Vol. I of Michie's Code of Alabama 1940, Recompiled 1958, 1973 Cumulative Supplement) is controlling. In other words, the new Judicial Article restructured the court system and redistributed the "judicial power" of this state, and I believe that this case and future cases must be governed by the Article's provisions.

I also feel compelled to point out, gratuitously, I suppose, that I believe that these intervenors have certain inalienable rights and that one of these is the right to practice law, if they are qualified. Justice Collier, *In Matter of Dorsey,* 7 Porter 293, 381 (1838), discussed the free choice of a citizen to practice law if he so desires. He wrote:

"It may be again said, that there is no deprivation of life, liberty or property,

consequent on a refusal to take the oath. I answer, that the law itself presumes the right to practice law, a valuable right, as it confers it as a boon, on those who can, and are willing to take the oath. Can it be seriously contended, that it is not a valuable right, and as deserving of protection as property? Suppose the right to practice law, was confined to a particular class or order of men, by law, would it not be esteemed a most valuable privilege? And if the right of entering this fraternity could be purchased with money, would it not command a high price? I think there can be no doubt of it; and if so, exclusion from it must be the privation of a valuable right; as worthy of the protection of the law, as property? I think, therefore, that in this view, the law in question, is contrary to the spirit, the plain intent, and meaning of that part of the tenth section of the bill of rights, which provides, that 'no one shall be deprived of life, liberty, or property, but by due course of law.'

"I am also of opinion, that the act in question, so far as it prescribes an expurgatory oath, as a condition to the practice of law in this State, (though passed with the most laudable motives,) is contrary to the very scope and design of a free government. The most arbitrary and vexatious inventions of tyranny, are those regulations of law, which interfere with the domestic concerns of society, by preventing the citizen from the pursuit of happiness in his own mode. The 'pursuit of happiness' is asserted in the Declaration of Independence, to be an inherent right; and is promulgated as a self-evident truth. And certainly if that expression means anything, it must include the right to select which of the various avocations or pursuits in life, a young man will engage in; his future destiny, and his value to the State, as one of its members, demands the utmost freedom of choice; and it is, therefore, of the highest impor-

tance, in a free government, that this right of choice should not be impaired. . . ."

I agree with Justice Collier, that any law or rule must not unreasonably impair a citizen's right to make his choice of a profession.