### In re LEVY et al.

District Court, S. D. New York.
Nov. 14, 1939.

John T. Cahill, U. S. Atty., of New York City (Mathias F. Correa, Henry L. Glenn, and Silvio J. Mollo, Asst. U. S. Attys., all of New York City, of counsel), for the government.

John W. Davis, of New York City (Harold Medina, of New York City, of counsel), for respondent Louis S. Levy.

George Z. Medalie, of New York City, for respondent Paul M. Hahn.

KNOX, District Judge..

In this proceeding, the United States Attorney asks that respondents, both of whom are members of this Bar, be disciplined for their alleged misconduct in concealing their knowledge of a loan of $250,000, made by Lord & Thomas to James J. Sullivan which, it is claimed, should have been disclosed in connection with certain litigation then pending before the Circuit Court of Appeals for the Second Judicial Circuit.

The matters set forth in the petition are an outgrowth of disclosures made in the trial which resulted in the conviction of Martin T. Manton, late Senior Judge of the aforesaid Appellate Court, for venality in office. In essence, the facts upon which I must pass are these:

Over the period extending from 1930 to the end of 1937, Levy, a practitioner at law for more than thirty years, was a member of the law firm of Chadbourne, Stanchfield & Levy. That organization handled most, if not all, of the important legal work of American Tobacco Company. Levy was a long time friend of Manton, and was interested in at least two of the latter's business enterprises. Of these, more hereafter will be said.

Hahn, as it were, had his maturity as a lawyer in Levy's firm. Being an able, alert and astute young man, he was assigned to matters having to do with the Tobacco Company. While so engaged, he came to the favorable notice of George W. Hill, its president. So great was Hill's regard for Hahn, that he persuaded Hahn to sever his connection with the law firm and become his chief assistant, at an annual salary of $50,000. Thereafter, he received a vastly increased rate of pay. Having been generously treated by both Levy and Hill, in the development of his career, Hahn naturally felt a sense of deep obligation to each of them. He was unacquainted with either Manton or Sullivan.

In 1931 and 1932, Lord & Thomas, an advertising firm, of which Albert D. Lasker was the guiding spirit, was engaged in exploiting the sale of Tobacco Company products, and this it did on a prodigious scale. Lasker thus came into close and frequent association with Hill and Hahn. Less frequently, but upon occasion, he had to do with Levy.

Against this background of personal relationships, Richard Reid Rogers, on or about February 20, 1931, began suit in the Supreme Court of the State of New York against the Tobacco Company, and certain of its officers, including Hill. The action was designed to enjoin the execution of a stock subscription plan, that had come into existence in January 1931, and which authorized officers and employees of the company to subscribe to a specified number of shares of its capital stock at a price of $25 per share, at a time when the exchange quotation was about $112 per share.

In April of 1931, Rogers began a similar action in the State Court, and joined Guaranty Trust Company as a party defendant. In due course, both actions were removed to this court, where they were consolidated and docketed under the designation E 59–307.

On or about February 23, 1932, this court entered a judgment whereby the Rogers' complaints were dismissed. From such decree, the plaintiff appealed to the Court of Appeals for this circuit. The

case was there docketed on March 19, 1932, and numbered No. 11,996.

Rogers, in March of 1931, started a stockholders suit against the Tobacco Company, Hill and other officials. This, too, was begun in the State Court, and the purpose of the bill was to obtain a judgment of invalidity of a by-law of the company, under which compensation, in addition to fixed salaries, might be paid to certain officers of the company. This action, like those already mentioned, was removed here. In May of 1931, Rogers instituted a similar suit in this court. The two were consolidated upon November 24, 1931. In March of 1932, Judge Caffey of this court, granted an injunction pendente lite, enjoining the company from making further payments under the provisions of the challenged by-law.

From this order, an appeal was taken on or about April 7, 1932, and was docketed in the appellate court under the number 12,040. In passing, it may be remarked that under the stock allotment plan, had it eventually been carried out, Hill would have been entitled to subscribe to 13,440 shares of Tobacco Company stock, at $25 each. Hahn, also, would have been a beneficiary, while Levy's firm stood to gain a possible $100,000. In the stockholders suit, it was also asked of defendants that they return to the Tobacco Company's treasury, a sum totalling upwards of ten million dollars.

In each of the above-mentioned actions, the firm of Chadbourne, Stanchfield & Levy appeared for the Tobacco Company, Hill, and other officials, who were defendants.

As previously indicated, Levy and Manton have known each other for many years. As a matter of fact, they were classmates at the Law School, from which they graduated in 1901. Levy is a man of superior intellect. Throughout his scholastic days, his achievements and distinctions were of a character of which any man might well be proud. Manton's youthful education and training had not been so broad and comprehensive. Thus it was, perhaps, that in their Law School days Levy came to give assistance to Manton, explaining the intricacies of reported decisions, and discussing with him the legal problems propounded by lecturers. In the years immediately following graduation, their relationship seems not to have been particularly intimate. However, in 1916, or thereabouts, Manton had an ambition to become a Federal Judge. In seeking its gratification, he wished the sponsorship of Levy's senior partner, the late John B. Stanchfield. In this behalf, Manton went to Levy and asked his intercession with Stanchfield. Levy was agreeable and approached his partner upon the subject. At first, Stanchfield declined to lend assistance, but finally, upon Levy's persuasion, complied with the request made upon him, and gave Manton his approval. There is nothing in the record by which the extent, if any, of Stanchfield's influence in bringing about Manton's appointment can be measured. Whether it was great or small, the fact is that, within a short time, Manton was appointed a Judge of this court, and in 1918 was elevated to the Circuit Court of Appeals. For some years following Manton's appointment to the Bench, Levy declares that, aside from greeting each other at a few social gatherings, he and Manton rarely met.

In 1927 or 1928, however, Levy and Manton were dinner guests at the home of a mutual friend. Shortly thereafter, Manton called Levy and said that he, Manton, "was interested in a large plot of ground known as the Holmes Airport and that it was an ideal place for the City of New York to have an airport * * * and that he had done a great deal of work on it * * * and that he thought it a very fine opportunity * * *" Levy was then asked if he did not have some connection with persons having to do with aviation. Levy replied that his firm represented the Curtiss-Wright Company, the North American Aviation Company, and had an association with Blair & Company, who were active in aviation matters. Being supplied with maps and data having to do with the land, Levy actively engaged in an endeavor, extending over several years, to dispose of this property for an airport. Being unsuccessful, Levy again lent his aid to Manton when the latter conceived the idea of utilizing the property for a low cost housing development. This scheme, like that of the proposed aviation field, came to naught. In 1936, Levy sought to turn the plot into a race course. In trying to do so, he negotiated with several persons interested in racing, but, once again, nothing was accomplished. Though failure was the result of each of these efforts, it was Levy's hope and expectation, as well as those of Manton, that had any one of the plans been successful, the profit upon the transaction

would be in the neighborhood of a million dollars. It should here be observed that, subsequent to 1932, in seeking to effectuate one or more of these plans, Levy expended something like $3,000, no part of which was contributed by Manton. Over the years in which the Holmes Airport property offered opportunity for financial gain, Manton and Levy would occasionally see and talk to each other concerning the prospects. These talks usually would take place in the course of morning walks of the men on the way to their respective offices.

In the year 1927, Levy became a stockholder in an enterprise known as the National Cellulose Corporation, in which Manton had a substantial investment. Levy says he first heard of this company from his partner, Thomas L. Chadbourne, now deceased. He states he was informed by Chadbourne that Manton had an interest in the company and that he, Chadbourne, had agreed to invest $75,000. in its stock. Upon Chadbourne's assurance that the purchase would be a "fine investment" Levy agreed to take over one-half of the Chadbourne commitment. Not having ready cash, Levy gave Chadbourne his note for $37,500, and placed his allotment of stock in the name of his secretary. A year or more later, Levy redeemed his note and continued as a stockholder. The president of National Cellulose Corporation was the late James J. Sullivan, a close friend and business associate of Manton. He was also an acquaintance of both Chadbourne and Levy.

Little, if any, of the foregoing recital of facts is in dispute between the parties. But, from this point on, the record is a maze of contradictions, lapses of memory, dim recollections, and what is more, in some instances, evasions, half truths and deliberate prevarications are to be found. The task of determining actualities is exceeding difficult, but it must be undertaken, and so I begin.

In the Fall of 1931, George W. Hill was on a hunting or fishing trip in a remote part of Canada. Prompt communication with him was difficult, if not impossible. A number of American Tobacco Company officials had pledged stock in that corporation with Guaranty Trust Company as collateral to notes upon which these officials were severally obligated. At about this time, as is well remembered by many persons, security values upon the Stock Exchange underwent a serious decline. American Tobacco stock was no exception, and, as its value melted away, the Trust Company carrying these loans, asked for additional margin in the sum of $150,000. When Hahn, and Taylor, the Treasurer of the Tobacco Company, were advised of this situation, they were desirous of protecting it for the benefit of their business associates. Being unable to reach Hill, either Hahn or Taylor got in touch with Levy. Levy and Taylor went to the bank seeking a withdrawal of its demands. Being refused, Levy stepped into the breach and in the following manner: Returning to his office he called Lasker, who was in Chicago, on the telephone. After explaining the circumstances surrounding the necessitous condition of the tobacco company officials, Levy gives his version of his talk with Lasker in these words: "Albert, what I want of you is to have you send me by telegram today $150,000. cash."

Lasker replied: "Will you guarantee it?"

Levy then said: "Well, Albert I am not going to ask you anything I would not do myself. If you will send it, I will guarantee it."

Lasker answered: "All right, I'll send it today but you write me a letter of guaranty tonight"

Levy proceeded to write Lasker the following communication, bearing date of October 5, 1931:

"Dear Albert:

"This is to confirm the fact that I have asked you to advance the sum of $150,000. and you have today sent me said sum as a loan to certain of the minor officials of the American Tobacco Company to protect their bank loans on American Tobacco stock, and I shall personally see that the money is repaid. You have thus assisted me in solving a difficult situation for which I profoundly thank you.

"Sincerely yours,

"Louis S. Levy"

Receiving the money, Levy at once applied it to the accounts of the several tobacco officials who were in trouble at the Trust Company.

So far as details go, there is disagreement between Lasker and Levy as to what was said over the telephone, but, at this moment, these differences are not particularly important. Suffice it to say that, in due course, the advance made by Lasker to Levy was repaid with interest.

Coming now to the Spring of 1932, it should be borne in mind that the appeals in the Tobacco Company cases, to which reference has been had, were pending in the appellate court of this circuit, and were shortly to be argued. Indeed, argument was had upon May 3rd and 4th, with Manton presiding. On or about June 13, 1932, the Court of Appeals, with one judge dissenting, decided the cases in favor of the Tobacco Company, Hill and the other officials, Manton writing the majority opinion.

At the hearing upon the present petition, Manton was called as a witness, and gave this testimony:

"Q. Do you recall having a conversation with Louis S. Levy in 1932 in regard to a loan to be made to James J. Sullivan? A. I do.

"Q. Will you tell us when that conversation took place? A. It was on the way down town in the morning and we walked a part ways down town.

"Q. And when did it take place? A. My best recollection is it was May or—the first part of May, 1932.

"Q. Will you tell us what that conversation was? A. It was very brief. Mr. Sullivan wanted to obtain a loan of $25,000. and he had been in to see me a day or two before that trying to obtain it and I mentioned it to Mr. Levy on the way downtown and Mr. Levy said to send him down to me, or 'to us'—I have forgotten which—and we will see what we can do for him. I think I asked him if he had any clients who might be interested in such a loan.

"Q. Now you say your conversation with Mr. Levy at that time was about a loan of only $25,000? A. Yes sir. * * *

"Q. Did you tell Mr. Sullivan to go down to see Mr. Levy? A. Yes, I did that.

"Q. And at that time— A. I don't know whether I told him to go down to see Mr. Levy or the Stanchfield & Levy firm—Chadbourne, Stanchfield & Levy, perhaps, one or the other. * * *

"Q. In this conversation that you had with Mr. Levy, walking downtown, did you tell Mr. Levy what Mr. Sullivan's problem was? A. Just that he was in need of money. To me it was a personal loan at that time.

"Q. You did not tell him for what purpose he needed the loan? A. I don't think so."

As bearing upon the weight to be given this testimony, it is important now to state that Levy says he "absolutely never discussed with Judge Manton any loan to Sullivan in the amount of $25,000, $250,000 or any other amount."

However this may be, one thing is certain. Under date of April 26, 1932, Manton's official stenographer typed a letter to Levy upon a sheet of government stationery, having no heading, and which was signed by the stenographer in the name of James J. Sullivan. It reads as follows:

"April 26, 1932.
"Dear Mr. Levy:—

"The first mortgage on the Esplanade Hotel is held by the Prudential Insurance Company, interest payable at 6%.

"The arrears of interest and taxes amount to $115,000. There is a second mortgage of $500,000. which would be satisfied on the execution of this new second of $250,000, which we are endeavoring to place through you. There is a third mortgage of $114,000. which we will have satisfied out of the moneys which we hope to secure from this new second mortgage. We expect to expend $35,000. installing kitchenettes and we will also install an oil burning system in place of the present coal burner.

"These are the only arrears on the property and this is what the money would be used for. The amount required is $250,000.

"Enclosed I am sending you copies of statements during our period of operation.

"We sold the hotel on June 1, 1931, to Mr. I. Kaplan, who was associated with a string of hotels. He operated it until some time in October, when the first mortgagee took possession of it under an assignment of lease and agreement of operation. Kaplan operated the San Moritz, Montclair, Dixie and Buckingham, and when he failed, it was necessary for the first mortgagee to take over the operation of the hotel on an assignment of rents. The figures for that period are not available.

"It was because of the failure of Kaplan that we must meet the arrears of the first mortgage and taxes.

"Yours very truly,
"James J. Sullivan

"Louis S. Levy, Esq.,
"25 Broadway,
"New York City."

Attached to the letter were some profit and loss statements having to do with the operations of the Esplanade Hotel. Levy

personally received and opened the letter on or about its date. Two weeks later, upon May 9th or 10th, 1932, Hill, Hahn and Lasker had a conference with reference to advertising at the office of the American Tobacco Company. Also present at the meeting was Ralph Sollitt, the then president of Lord & Thomas. At the conclusion of the session, Lasker states he was approached by Hahn, who asked him to step into a room adjoining the one occupied by Hill. Upon compliance with this request, Hahn, says Lasker, continued: "I want to speak to you on a matter that Mr. Hill is embarrassed to speak to you about. * * * You remember that loan you made at the request of Louis Levy last fall * * *"

Receiving an affirmative reply, Hahn, according to Lasker, said: "An identical situation has arisen. This time it is $250,000. Will you accommodate us?

As to what then transpired, I quote from Lasker's testimony: " 'Surely,' (I said) 'but I don't want it out indefinitely. When will it be paid back?' 'Oh,' he said, 'at the outside in a few months.' I said 'Let us define what you mean by a few months. Do you mean four months?' He said 'Yes, four months.' I said, 'All right we will be glad to accommodate you.' 'Well,' he said, 'this time I want a man to give you a note.' And he says 'You can have collateral or real estate.' And I said, 'We don't want any note, we don't want any collateral. We are doing this for your accommodation. You take it.' 'No,' he says, 'for my own reason, I would like for the man to have a note with collateral.' 'Well,' I said, 'with collateral of stock. The real estate,' I said, 'is out. Leave the stock. We don't want real estate. That takes a lot of detail.' 'Well,' he said, 'I would like to send the man to do his own talking.' And I said, 'No, don't do that because we have to take Mr. Sollitt's time. This afternoon, I am going away. You send him up to see Mr. Sollitt tomorrow.' "

The talk between Hahn and Lasker was within the presence and hearing of Sollitt. Following the conversation, and after Lasker and Sollitt had left the office, Hahn called Levy by telephone and told him that Lasker had been spoken to but that, as the latter was leaving for Chicago, he could not see Sullivan and that Levy should send Sullivan to see Sollitt.

Levy states he has no recollection of speaking to Hahn about the arrangements made with Lasker, but he does admit that, at about this time, Sullivan called him on the telephone to ask if Levy had news for him. In response, Levy said: "Yes, I understand that if you will go up to Lord & Thomas, they will give consideration to your application." Sullivan then inquired: "What shall I tell them?" and Levy replied: "Tell them everything. Show them what you have got; show them how you are going to pay it back. Tell them what you are going to use the money for. Tell them everything that you can think will influence them in making the loan." Sullivan queried: "What shall I give them?" and Levy answered: "Give them everything they ask, and be sure and bring them a statement showing them exactly where you stand."

There is some dispute as to whether Sullivan called at the office of Lord & Thomas upon May 11 only, or upon both May 10 and May 11. It makes no difference, for upon one day or the other, and possibly on each, Sullivan saw and talked with Sollitt. Sollitt called Hahn, informing him of Sullivan's presence, and speaking of Sullivan's financial statement. Hahn, being asked the type of note to be taken from Sullivan, suggested that, inasmuch as the money was wanted for only a short time, a demand note would be appropriate.

When Sullivan saw Sollitt upon May 11, 1932, he received a loan of a quarter of a million dollars. As soon as the check was issued, Sollitt sent the following letter to the Comptroller of Lord & Thomas, located in Chicago:

"May 11, 1932

"Dear Mr. Sachse:

"Today I issued check #129 on the Manufacturers Trust Company of New York in the amount of $250,000. payable to Mr. James J. Sullivan, whose business address is 366 Fifth Avenue, New York, and whose home address is 27-86th Street, Brooklyn, New York.

"This represents a loan that I made to Mr. Sullivan and I am enclosing his demand. note for $250,000., payable with interest at 5%.

"As security for the loan, Mr. Sullivan has given us 15,604 shares of the National Cellulose Corporation, of which Mr. Sullivan is President and principal stockholder, and whose statement I am also enclosing.

"Sincerely,

"Ralph"

When the Comptroller, Sachse, received the note, collateral and financial statement,

he took charge of them, and save for one incident to which reference will later be made, they remained undisturbed for about four months. What then transpired will also be described hereafter. For the present, it is enough to observe that within a few weeks after the loan was consummated, and prior to the decisions on the appeals in the Rogers suits, more than $200,000 of its proceeds had found their way into corporations in which Manton was vitally interested. Apparently, Sullivan was little more than a conduit, through which money syphoned from Lord & Thomas by Hahn and Levy, flowed into Manton's depleted reservoirs.

The explanations given by Levy and Hahn in justification of their activities in obtaining the loan, should now be set forth:

Hahn states that, in April 1932, Chadbourne called him on the telephone and said:

" 'You know Albert Lasker very well, don't you?' and I said I did. He said, 'I would like to ask you to do a favor for me.' I asked Mr. Chadbourne what it was. He said the firm was interested in a company called National Cellulose Corporation; that the company was engaged in the business of cellulose products; that the president of the company, named James J. Sullivan, was a friend, and I think he said a client of his. He spoke very highly in the telephone conversation of Sullivan and of his responsibility. He said that Sullivan had come to him for a loan of $250,000. to be secured by, I think he said, the majority stock or the controlling interest in the Cellulose Corporation. He said that he would like very much to make the loan to Sullivan, but it was not at that moment convenient for him to make it, or that he did not have the funds at that time. I think he used the word 'convenient.' He said that it had occurred to him that Mr. Albert Lasker might be interested in making such a loan because Mr. Lasker was very familiar with the business of cellulose products and would know the security which was offered, and he asked me whether I would speak to Mr. Lasker and ask him to see Sullivan.

"I told Mr. Chadbourne that I would be glad to, but that I did not know when I could, because Mr. Lasker's office was in Chicago and he only came to New York now and then."

Chadbourne said: "That is all right. Sullivan is not ready for this any way at this time. Don't do anything about it until you hear from me again. * * *" .

About two weeks later, Chadbourne again called Hahn on the telephone and said: "About arranging a meeting between Mr. Lasker and Mr. Sullivan, I am about to sail for Europe in a few days. I have spoken to Louis Levy about this and I have asked him to follow it up. When Mr. Levy tells you that Sullivan is ready to see Mr. Lasker, will you please arrange the meeting for him? * * * I will appreciate anything you do to help this along. I am very much interested in Sullivan getting this loan."

Hahn expressed his willingness to be of service and the talk ended.

This last conversation between Hahn and Chadbourne occurred soon after the middle of April 1932. About two weeks later, Levy called Hahn and said that Chadbourne had told him of his talks with Hahn, and that Sullivan was now ready to see Lasker. He then requested Hahn to make arrangements for the meeting. Levy reminded Hahn that Chadbourne would much appreciate his doing so and said: "Sullivan is a thoroughly responsible man" and added, "This loan is wanted for only a short time and it will be repaid promptly."

According to Hahn, Lasker came to New York to attend an advertising meeting upon May 9, but before it took place, Hahn told Hill that he was going to speak to Lasker "about a matter that Mr. Chadbourne was personally interested in, and that Mr. Chadbourne and Mr. Levy had spoken to him about it."

After explanation was made to Hill as to what Chadbourne and Levy had asked Hahn to do, Hill remarked: "Well, all you can do is to tell Albert (Lasker) what Tom Chadbourne and Louis Levy have told you."

The advertising meeting proceeded and at its conclusion Hahn, as has already been told, made his approach to Lasker. Hahn's account of the conversation is this:

" 'I told Mr. Lasker that I had been asked to speak to him by Mr. Chadbourne and by Mr. Levy and, to the best of my recollection, I repeated the telephone conversation which had been given to me, telling Mr. Lasker that Mr. Chadbourne was interested in a man named James J. Sullivan, who was president of National Cellulose Corporation; that the company was engaged in the business of cellulose products; that Sullivan had come to Mr. Chad-

bourne for a loan of $250,000; that it was not convenient for Mr. Chadbourne at that time to make the loan or else he would make it; that Sullivan offered as security the majority of the stock in the National Cellulose Company; that the loan was wanted for a very short time; that it was to be repaid promptly; that I had been assured by both Mr. Chadbourne and Mr. Levy that Sullivan was a responsible man and that this was a good loan; and that I had been asked to ask Mr. Lasker whether he would see Mr. Sullivan and let Sullivan put his proposition up to Mr. Lasker.' Mr. Lasker said: 'Well for how long—for how long would this loan be?' And I said * * * 'I am told by Mr. Chadbourne and Mr. Levy that it will be repaid in a short time * * * And I recall saying to Mr. Lasker that Mr. Levy assures me that this loan will be promptly repaid' and I remember Mr. Lasker asking me some questions about Mr. Levy's assurance and my answering that 'Mr. Lasker, well, you know from your own experience with Mr. Levy on the matter·of the $150,000. loan that when Mr. Levy says something it can be depended upon.' Mr. Lasker replied 'Well I can't see him, I am leaving. I cannot see Sullivan * * * I am taking a train for Chicago this afternoon, but you can tell Mr. Levy to send him to see Ralph Sollitt.' "

Lasker testified, it will be recalled, that Hahn said he was talking for Hill, who was embarrassed to speak for himself. Hahn specifically denies having said that to Lasker.

Levy's version of the manner in which he first knew of a contemplated loan to Sullivan is that one day Chadbourne came into his office and said: "Our paper company (National Cellulose Corporation) is doing very well. It is going to be a great success, it is earning money and paying dividends, but the president Sullivan, is in a personal jam and he needs $250,000., and ·I don't want to see him hurt. Now he is a very necessary, important and substantial citizen, and if I had the money, I would give it to him myself. He is the whole company. But he has no collateral that a bank would take because there is no market for it and there is only one person, the only people who would appreciate the value are the people in the business, and therefore I concluded that his best chance to get the money is from Lasker who would know all about it, and I have asked Paul Hahn to arrange an introduction for him with Lord

& Thomas to see whether they would not loan the money."

Levy says his recollection is that Chadbourne added that he had twice talked to Hahn, but had received no report. Levy says further that Chadbourne, being about to sail for Europe, asked him in the event that Hahn should make a report during Chadbourne's absence, to pass it along to Sullivan. As has been seen, Levy did as Chadbourne requested. Chadbourne sailed upon April 22, 1932.

Several days after the Sullivan note and its collateral reached Sachse, the Comptroller of Lord & Thomas, he took the papers to Lasker for the purpose of exhibiting them to him. Sachse testified that Lasker declined to look at the documents, saying: "I am not interested about the collateral. This is merely an accommodation loan to the American Tobacco Company or its executives or officers similar to the loan that we made last year. Payment has been promised in four months. If it does not come through, will you please bring it up to me at that time."

Sachse says that when the four months had gone by, he again went to Lasker, telling him the note had not been paid. Upon this occasion, Lasker examined the papers. In doing so, he discovered that National Cellulose Corporation was the manufacturer of a product known as "Puritas" which, in a small way, was in competition with an article of merchandise called "Kotex", in the exploitation of which Lasker, with a number of friends, was interested. These men, it appears, had considered the Puritas competition as being unfair, and Lasker found himself chagrined to learn that, through him, a loan had been made upon stock of National Cellulose Corporation. Not wishing to withhold the fact from his associates in the Kotex business, Lasker immediately informed them of what he had done. He also communicated with Sollitt asking him to see Hahn and have him arrange for repayment of the loan. Sollitt talked to Hahn, who expressed surprise that nothing had been paid, either by way of principal or interest, and suggested that Sullivan be billed. This word was relayed to Chicago, and, several weeks later, Sachse sent a bill for interest to Sullivan. It produced no result. Six months later, Sachse, upon instructions from Sollitt or Lasker, sent a bill for a year's interest, and

accompanied it with a letter. Again there was no response.

At about this time, Lasker began insistently to importune Hahn to have the note redeemed. According to Lasker Hahn's usual reply was: "Yes, I know it ought to be paid. I know we promised to pay it, but it is not convenient."

Things ran along in much this fashion for two years or more from the date of the loan. During this period, about all that happened were telephone and personal talks between Hahn and Chadbourne in which Hahn endeavored to have Chadbourne press Sullivan for payment. On these occasions, Chadbourne would tell Hahn, in substance, that while Sullivan was then tied up financially, it was just a question of time when his finances would straighten themselves and the loan would be repaid. When Hahn realized that no progress was being made with Chadbourne, he asked Levy to impress Chadbourne with the desirability of having the loan paid. At such times, Levy told Hahn he would speak to Chadbourne, and later, Levy would report that he had done so, and say that Chadbourne stated the loan to be alright, and that it would be paid soon.

In 1934, Hahn became much disturbed at the delay and spoke to Hill about the matter and was told that neither Lasker nor Sollitt had mentioned the matter to him, but that the thing for Hahn to do was "to keep affer Tom Chadbourne and Levy to get this thing cleaned up, and in the meanwhile, not to worry."

Nearby this time, Hahn consulted with George W. Whiteside, a partner in the firm of Chadbourne, Stanchfield and Levy, and besought him to speak to Chadbourne about the situation. Whiteside saw not only Chadbourne, but Levy as well. All he received in return were assurances such as previously had been given to Hahn. This occurred again in 1935.

In the late fall or early winter of that year, Lasker retained Max D. Steuer to represent him in an effort to collect the note. Shortly before doing so, Manton had tried to reach Lasker by telephone, but Lasker wouldn't talk with him. On January 22, 1936, Manton wrote to Lasker, who then was in Florida, saying inter alia, "I desire to see you at an early date. Are you returning to New York shortly? If not, I could come to Florida to see you within the next two weeks. Please advise me if this will be convenient."

The letter went unanswered:

Meanwhile, Sullivan had died, and Manton was executor of his will. The estate, however, proved to be insolvent.

Upon Steuer's retention, he saw Levy and related to him the account of the matter which Lasker had given Steuer.

Upon hearing from Steuer that Lasker had asserted Hahn to have said that the loan to be made to Sullivan would be of the same nature as the loan of $150,000 which Lasker had previously made to Levy, the latter said: "This talk that Lasker told you he had with Hahn I have never heard a word of. I will see Paul Hahn and I will let you hear from me."

Hahn was in England and Levy could not communicate with him. During Hahn's absence, Steuer went to see Manton, having been informed of the latter's letter to Lasker, Steuer told Manton that Lasker was not in a mood for talking business, whereupon Manton, according to Steuer, said: "I have got a great proposition for him, and he is the one man that could make a great thing out of it."

Steuer further testifies that Manton, after stating he had a large or controlling interest in National Cellulose Corporation, suggested that Lasker buy out the company, or merge it with the Cellulose Corporation engaged in the manufacture or exploitation of Kotex. Following this discussion, Manton sent an auditor's report of his company to Steuer. Upon its receipt, Steuer again saw Levy. The report, it was agreed between them, was practically valueless and that, if a true picture of National Cellulose Corporation were to be had, a more comprehensive examination should be had of its affairs. Discussing the cost of such examination, Steuer testifies that Levy said: "We might be interested. There might be a good proposition here. It might be possible to merge these concerns and if not, my firm might well pay for it (the report)."

Upon that basis of understanding, Steuer engaged Leidesdorf & Company to find out the condition of the corporation and make a report thereon. The cost of the examination was $885.98, which was defrayed by Chadbourne, Stanchfield & Levy. When the report came in, it appeared that National Cellulose Corporation was not particularly thriving, and that the book value of its stock held by Lasker as collateral to the Sullivan loan, was $100,000 short of the face of the note.

At this juncture, and with full knowledge of the result of the Leidesdorf examination, Levy, accompanied by Whiteside, called on Steuer, and told him that thereafter Whiteside would be in charge of the Sullivan matter and that he, Levy, would have nothing more to do with it. Before departing from Steuer's office, however, Levy gave Steuer his version of the details of his connection with the National Cellulose Corporation and, also, told him of how he came to speak to Hahn about the $250,000 loan.

Observation should here be made that Louis Bissell, a partner in the firm of Chadbourne, Stanchfield & Levy, at the time that Chadbourne and Levy purchased stock in National Cellulose Corporation, had gone on its Board of Directors for the purpose of looking after the interests of his office associates. With this fact Levy was acquainted. He also knew the company to be a client of his firm, but disclaims information concerning the extent to which the company's business was handled by his firm.

When Levy had related to Steuer and Whiteside his account of what he had done, he left the meeting.

Steuer then said to Whiteside that, knowing the relations between Lasker, Hill and Hahn, he did not wish to disturb them, but he did want a return of the money advanced by Lord & Thomas, and asked Whiteside to suggest how that could be accomplished. Whiteside then informed Steuer that Hahn's story concerning his first conversation with Lasker in regard to the loan was quite different from Lasker's, in that Hahn denied stating that the loan was to be of the same character as the one previously made to Levy.

Whiteside added that no showing had been made that Lord & Thomas could not recover the money from the collateral and the Sullivan estate, and inquired of Steuer why a claim was not filed in the probate proceedings, saying: "See what you realize out of that and then we will talk about the balance, and we ought to be able to get together."

Steuer answered that Lord & Thomas positively would not take such action, inasmuch as they never made a loan to Sullivan, but advanced the money upon the faith and credit of Hahn, who was acting upon behalf of Hill. Whiteside again suggested that Steuer should seek to realize some recovery from the collateral and the Sullivan estate, and, in reference thereto, Steuer wrote to Albert L. Hopkins, who is Lasker's personal attorney in Chicago. Hopkins replied that Lord & Thomas would not file a claim and would give no recognition to Sullivan's part in the loan transaction.

Later, there was a further conference between Whiteside and Steuer, at which time Whiteside learned that Lord & Thomas had been cited as a creditor of the Sullivan estate to file its claim within a specified period or be barred from doing so. Whiteside then told Steuer that "neither Hill, Hahn, nor the Tobacco Company, would recognize any responsibility for the money advanced to Sullivan."

Thus matters stood until a subsequent date when Whiteside again talked to Steuer, who deposes that his caller spoke as follows: "I told you that we don't want Lasker or Lord & Thomas to lose anything on this transaction; we don't think they ought to. On the other hand, I repeat, we don't want to give our recognition to this transaction. The way that this can be done is that Lasker and the American Tobacco Company can always use advertising; in this business when Lord & Thomas gets an order, no matter what its size, they get fifteen percent. In sending out advertising matter, magazines, newspapers, the effort is no greater, certainly not perceptively greater whether it is two million, five million, eight or ten million, and they can give to Lord & Thomas sufficient additional advertising to make up for the difference between what you realize on the sale of the collateral plus what you may have collected from the estate."

Whiteside asked that his suggestion be communicated to Lord & Thomas, and Steuer complied by writing Hopkins, who rejected it. When word of this was given to Whiteside, he said to Steuer: "Well, now, I have another thought. Hahn is over in England. Lord & Thomas have an English branch. They can do advertising over there and that advertising can make up the difference between what can be realized always from these two sources, from the estate or from the sale of the collateral. Put that up to them."

This proposal was submitted to Hopkins, and it, like the earlier one, was unacceptable. Hopkins stated as one reason for the rejection that, whatever business Lord & Thomas did would be subject to accruals of taxes and, therefore, it would be impossible to determine when the debt would be paid in full.

Whiteside then advanced a third plan. It was to the effect that since the Tobacco Company had conducted a series of highly successful radio programs, about which Lasker had given advice, and that, if he resorted to his collateral and made claim against Sullivan's estate, he could send a bill to the Tobacco Company for the difference between his recovery and the amount due on the note. Steuer testifies that Whiteside added: "If this proposition is not satisfactory, it is the last I will make—you can take it or leave it."

Steuer said he would so inform his principals. Steuer, at this time had come to consider the fact that the statute of limitations would shortly run. For his own protection he wrote to Hopkins, saying that since he had been directed neither to sue nor file a claim, there was nothing further that he could do, and he was returning all papers in the matter. In another letter he wrote: "Mr. Whiteside said that Hill would not pay because he could not pay, not because he did not desire to pay."

Whiteside denies ever having made such a statement and avers that the proposals made to Steuer were never authorized by the Tobacco Company which he then represented, and that he made them merely as "bait" to ascertain Lasker's real purpose in seeking to impose liability on Hahn, Hill or the Tobacco Company. His thought was that Lasker was using the loan to Sullivan as an instrumentality of pressure to improve his relationship with the Tobacco Company.

All that came from these conferences and negotiations is that no claim was filed against Sullivan's estate, and there is now a good legal defense, viz., the statute of limitations, to any action that might be brought upon the note.

Such, in substance, is the story I am asked to believe. If it be true, I have heard of one of the most fantastic business transactions that ever came to my ears. If what has been stated correctly sets forth all that was said and done as respects the Sullivan loan, the course of procedure of the parties in dealing with it is a source of amazement and astonishment. Here was a group of men composed of persons possessing minds as acute as any that are to be found; persons, too, of wide experience, not only in business, but in law, and yet, for some reason not clearly disclosed, acting as though they were children lost in the woods, and fearful of the shadows about them.

When Lasker was asked why, if he believed Hill was under obligation upon account of the loan, he did not go straight to him and present his claim, the answer was that his advertising relationship with the Tobacco Company was highly profitable, and he did not wish to jeopardize his position by offending Hill.

When Hahn went to Whiteside and told him of Lasker's demand, he was advised he should have no further discussions upon the subject of the loan with either Levy or Chadbourne.

Furthermore, when Whiteside was advising Hahn, and although both Levy and Chadbourne were Whiteside's partners, neither of them was pressed in an endeavor to get a complete revelation of the facts. This apparent neglect to take steps which would appear completely normal is ascribed to Whiteside's lack of knowledge of anything, "from what Mr. Levy or Mr. Hahn said in relation to the whole matter that would further clarify it, except the representation that had been made * * that Mr. Sullivan was a man of substance, that he had considerable interests in various matters and that he had a very large holding in the National Cellulose Company."

Having been assured by Levy and Hahn that Sullivan was a man of means and substance, Whiteside says he felt there was no necessity for him personally to make further inquiry into the situation.

But, laying aside the actions or inactions of some of the witnesses who later played a part in this matter, and which now seem to have been inconsistent, and disregarding conflicts in their testimony as to happenings following 1933, there is an indisputable item of proof that is most significant. It is the letter of April 26, 1932, to which Manton's secretary appended the name of James J. Sullivan, and sent to Levy. A brief summary of evidence, which I regard as entirely credible, will demonstrate the high importance of that communication.

First of all, the contents of the letter indicate that its subject matter had previously been discussed between Levy and some other person or persons. As clearly as words can do, the text of the communication informed Levy that Sullivan needed $250,000 to relieve the necessities of the

Esplanade Hotel. If Levy was not already aware of Manton's interest in that property, and it is my belief that he was, he might easily have learned the fact by the simplest kind of inquiry. But, whatever his knowledge concerning ownership of the Esplanade, the fact is that within a few days of the date on which the letter reached Levy, and very shortly before argument on the Tobacco appeals was to begin, Manton, presiding judge of the court before which Levy's firm was soon to appear, approached Levy for a loan to Sullivan, and Levy told Manton to send Sullivan "to me" (Levy) or "to us" (Chadbourne, Stanchfield & Levy). It is of small moment whether the sum that Manton mentioned as being needed by Sullivan was $25,000, or $250,000. The alacrity, however, with which Levy gave assistance to Sullivan in procuring a loan of $250,000 tends to corroborate Manton's statement that he told Levy of Sullivan's need for money. And Manton's approach to Levy, let it be remembered, was upon the eve of an occasion that would determine whether Levy's clients would win or lose litigations involving millions of dollars, and in which Levy's firm, aside from its legal fees, stood to benefit to the extent of $100,000.

Under these circumstances, the letter of April 26, 1932, must indelibly have impressed itself upon Levy's mind. Moreover, a letter such as the one in question, particularly when written upon behalf of one who, as Levy implies, was a comparative stranger to himself, is not likely to be forgotten.

And when this man, through Levy's quick and ready assistance, was enabled to procure a loan of $250,000, it seems to me that each incident connected with the transaction had become something that Levy never could forget. Nevertheless, when Sullivan, within less than six months, was in default, and Levy was in discussion with Hahn and Chadbourne as to what should be done, Levy now says, he was without recollection of the letter of April 26, 1932, and failed to associate it with the loan. Belief in that assertion would require me to go far beyond the limits of my credulity.

Had Levy, at any time, been acting in the mistaken but honest conviction that, under circumstances as they existed between himself and Manton in early May of 1932, he might properly, at Manton's instance, secure a loan for Sullivan, the natural thing for him to have done when Sullivan failed in the performance of his obligations, was to go to Sullivan and ask that some accounting be made of the money. He might even have asked Manton to speak to Sullivan. Instead of doing either or both of these things, Levy studiously ignored Sullivan and held his peace, both as to the letter and Manton's connection with the transaction. So far as appears, Levy never even mentioned the letter to Chadbourne upon whom he says he was relying in his desire to have Sullivan take care of the note. And this, notwithstanding that Chadbourne was in personal touch with Sullivan. If Levy, as he would have one believe, was innocently drawn into the matter by Chadbourne, and if his own activities were scrupulously open and aboveboard, the least he should have done, when the note went into default, was to do his utmost to see that Sullivan should furnish further security to Lord & Thomas in the form of a mortgage upon the Esplanade.

When, again and again, Levy's attention was directed to the continuing default of Sullivan, and he was in conference with Whiteside and Steuer as to what was to be done, he made no mention of the letter. Had he done so, it is not improbable that these men might have saved Lord & Thomas a portion of the loss it has sustained. This is not all. When Grand Juries, both Federal and State, began investigations into Manton's affairs, Levy was apprised and became a witness in the proceedings. While pretending to have made an effort to refresh his memory from every available source, his search for record evidence fell far short of discovery of the letter of April 26, 1932. When ultimately, the letter did come to light, and Whiteside expressed himself as to the letter's importance and asked Levy's present partners, Leve and Hecht, to inform Levy of its existence, both Leve and Hecht treated it as a leprous document. Had the United States Attorney not discovered, a few days before hearings began upon this proceeding, that the letter was in Levy's office, I believe it never would have been produced.

The foregoing recital of the relationship existing between Levy upon one side, and Manton and Sullivan upon the other, during the pendency of the Tobacco suits before the Circuit Court of Appeals, shows Manton's complete disqualification to sit in review of the disposition which this

court had made of the cases. In good conscience, he should have retired of his own volition. When he was not moved so to do, there was a duty which imposed itself upon Levy. Trained lawyer that he is, and possessing an experience gained in more than thirty years of practice, he should have appreciated instantly that his dealings with Manton had been such that, aside from any consideration of venality, they might well be calculated to warp or bias Manton's judgment and prevent him from having the impartiality of mind that was required for the proper performance of his judicial duties. See Canon 26 of Judicial Ethics. Had Manton's colleagues upon the Court been advised of the connection existing between him and Levy, it is unthinkable that either of them would have sat with Manton upon the appeals. Had Rogers and his attorneys been advised of the close associations of Manton and Levy, it is as certain as day that an affidavit of bias and prejudice would have been filed against Manton. But, Levy stood mute, being ready, willing and anxious to accept the judicial favor of one whose decision he hoped, believed and expected would soon be his own, and that of his clients. If it should be, by some remote chance, that Levy, when Manton did not disqualify himself, was without a sense of propriety sufficiently sensitive to impel him to take affirmative action in the matter, the density of his sensibilities are such that he ought not to practice at this bar. In my judgment, however, Levy, in mind, heart and action, was venal and corrupt. His conduct here is not altogether unlike that which he exhibited, some twenty years ago, in respect to the Siegel bankruptcy proceedings where, for purposes obviously improper, he paid money not only to creditors, but also to the trustee in charge of the estate.

At that time, Levy escaped both prosecution and discipline. By virtue of the statute of limitations, he cannot here be prosecuted, but he can and will be disciplined. The discipline to be administered will be his disbarment from further practice before this court. That should be his portion for a further reason: It is that, by false swearing, he did his utmost to obstruct the justice of this proceeding. In addition to falsifying concerning the letter of April 26, 1932, and the more important details of the Sullivan loan, there are a number of other glaring examples of his endeavors to mislead the Court. Among them are these:

(1) His denial that Manton spoke to him about a loan to Sullivan.

(2) His statement that he did not know of the consummation of the loan until Hahn advised him that Sullivan wasn't acting well.

(3) His denial of knowledge of Manton's financial involvements and real estate holdings.

There is still another matter which is indicative of Levy's willingness to pervert justice. It has to do with a female friend and client who placed her financial affairs in his hands. It was her understanding that Levy's services would be performed gratuitously. Levy, while charging nothing for what he did, employed his brother, Samuel, to do some work in connection with this account at a monthly salary of $500 per month. From the evidence taken upon these hearings, there is reason to believe that the client was unaware of this arrangement until the payments to Levy's brother amounted upwards of $45,000. Levy asserts that the client had been advised of the compensation being paid his brother, but can produce no proof in the way of corroboration. The matter was one that caused dissension between Levy and Chadbourne, and was a contributing factor in the withdrawal of Levy from the firm of Chadbourne, Stanchfield & Levy.

Whatever be the truth as to whether the client had been told concerning the depletion of her funds through payments made to Levy's brother, the fact is that, when Chadbourne insisted that restitution be made, Levy saw to it that the full salary previously paid to his brother was returned to the client.

During Levy's examination upon this subject matter, he introduced several letters from the client which were friendly in tone, and commendatory of himself. He also read into the record a letter dated October 31, 1936, which he sent the client after this dispute with Chadbourne, in which he sought to justify what had been done. Thereafter, the Court addressed this question to Levy: "You received no response to this last letter?" Levy replied: "I don't recall that I did, but I do recall Mr. Chadbourne telling me after that letter was delivered there was no use trying to see her or write to her, she would not see me."

At a subsequent stage of the proceedings, questions were asked and answered as follows:

"Q. Is there any correspondence in the files of your old firm so far as you know from this woman protesting about any action of yours? A. I would say from recollection that there has never been even a suggestion of protest, only terms of highest praise.

"Q. No, what I mean to say is, that apparently she was dissatisfied at some stage of the proceedings, because that is what Mr. Chadbourne said to you. A. At the end.

"Q. Yes. Now, at or about that time I should like to know if there was any correspondence between your old firm and the woman upon the subject matter of her dissatisfaction? A. No, I never heard anything about her dissatisfaction. I think, I had no correspondence with her."

Within a few minutes after this testimony was given, it was shown beyond peradventure that under date of November 13, 1936, the client sent a letter to Levy which reads:

"Hotel Chatham
"Vanderbilt Ave at 48th Street
"New York
"Nov. 13th, 1936.

"Dear Louis:

"I arrived yesterday on the Rex en route to California. Tom tells me you want to talk to me about the $6000 a year paid to your brother since 1929. I feel such an interview would be very painful to us both and I much prefer that you should settle the matter with Tom and after the settlement is arrived at, I shall be very glad to see you.

"For years, as you know, I have been profoundly grateful to you for interesting yourself in my affairs as you so kindly volunteered to do and the fact that you always refused to consider any payment increased my gratitude to such an extent that I hit upon the idea of leaving you the Paris flat in my will as a token of my esteem and to provide you with at least compensation even though belated for the trouble you had taken on my behalf. I feel dreadfully that you made me believe it was only in purest friendship you were looking after my affairs when you were continually paying $6000 a year from my estate to your brother and without my knowledge. I am sad and sick at heart over it all and I just can't talk about it any more. I'll give Tom a copy of this letter and he will do all the talking for me. I am going to his home in the country tomorrow for a visit and when I come back from California perhaps you will come in to see me one day if you care to.

"Yours very sincerely

"M"

Although Levy's dealings with this client are wholly collateral to the charges here made against him, his failure to recall the letter just quoted is strikingly similar to his alleged loss of recollection of the Sullivan communication of April 26, 1932. In my opinion, Levy's memory, as respects such letter, was completely clear and that, concerning both, he sought to mislead and deceive the Court.

Let the order for Levy's disbarment be predicated, not alone upon the matters set forth in the petition, but also upon his false swearing and deceit in this proceeding.

■ Upon this record, there is a marked difference between Levy's culpability and that which attaches itself to Hahn. As earlier set forth, Hahn was unacquainted with either Manton or Sullivan. Neither was he acquainted with Levy's dealings with either of them. While deeply interested in the Rogers litigations, he was attorney of record for none of the defendants. If, therefore, he was not actually a party to a plan to corrupt Manton, and of this there is no convincing proof, it is possible that his activities are susceptible of a fairly reasonable interpretation, and one that will save him from discipline.

When asked by Chadbourne and Levy to request Lasker to make the loan, Hahn could not well refuse. Had he done so, a breach might well have been created between himself and men who had befriended him. And Hahn, of course, did not want this to occur. And, if it be assumed that Hahn, in the first instance, was animated by honest motives, his later actions, foolish and futile as they were, ought not, as the evidence stands, to subject him to condemnation.

In his first conversation with Hahn, Lasker undoubtedly gained a definite impression that the loan to Sullivan was to be similar in all respects to the one made to Levy in 1931. Lasker's attitude, at all times, quite as much as his testimony, supports this conclusion. He never regarded Sullivan as being any other than a nom-

inal party, who was acting for Hill. When the note was defaulted, it was Hahn who was asked to hasten payment, and, from first to last, Lasker looked to Hill and Hahn for repayment of the money.

If Lasker's recollection of what Hahn said to him is correct, he was certainly warranted in wanting and expecting Hill and Hahn to assume full responsibility for the transaction. And, even upon Hahn's statement of the conversation, it is not difficult to perceive how Lasker, who is of dynamic energy, and accustomed to thinking, speaking and acting both quickly and impulsively, might readily assume that Hill was the principal and Hahn his agent. The talk was very brief. Lasker was impatient to get away, and the earlier loan to Levy was mentioned. Remembering, as Lasker did, that Hill's name had been used when Lasker advanced $150,000 to Levy, it may be that Lasker, believing Hill to be a wealthy man, allowed himself to think that Hill, being again concerned, might feel embarrassed to admit need of assistance in raising $250,000. If that thought came to Lasker at the time, he might now honestly believe Hahn had so stated, even though such were not the fact. Without wishing to cast the slightest reflection upon Lasker's desire accurately to relate precisely what was said and done, it is probable that, in some respects, his memory is in error. Having been shamefully treated, he keenly feels the wrong he had nursed and warmed for more than seven years. It is quite understandable, therefore, that Lasker's present recollection may be tinged unintentionally with feelings of outrage and resentment. For example, Sollitt does not recall that Hahn, in the course of the first interview, said: "I want to speak to you on a matter that Mr. Hill is embarrassed to speak to you about."

Sollitt does corroborate Lasker in saying that the loan was to be wholly similar to the Levy transaction of 1931. Sollitt's recollection, however, is not entirely clear as to the exact words that were spoken, and, possibly, when reference was made to the Levy loan, he thought the one to be made to Sullivan was, in all respects, similar, when, in fact, it was to be similar only in part.

Nevertheless, there are conflicts of testimony between Lasker, Sollitt and Hahn which are not susceptible to reconciliation upon any basis, and it is idle to make the attempt. Hahn's course of action, too, in the two years following default in the note, differed from that which I think should have been pursued by one who had played the part of an intermediary in a loan transaction. But, considering Hahn's former relationship with both Chadbourne and Levy, as well as that which existed between Lasker, Hill and the Tobacco Company, it may be that Hahn fully believed the assurances given him by Chadbourne and Levy and thought the loan would soon be paid. If he did, there is excuse, if not justification, for the way in which he temporized with the situation. Hoping and believing that men who had been his benefactors would not long leave him in the lurch in which he found himself, Hahn, perhaps, was less than frank with Lasker, and made statements that were open to the interpretation which Lasker put upon them.

Whether or not my surmises as respects Hahn are correct, and they are not altogether satisfactory to myself, I feel, upon the whole, that the evidence as to him is not so clear and convincing as to warrant disciplinary action.

Should it be that Hahn was a victim of Levy's and Chadbourne's imposition, and there is some ground for that view, he ought not be judicially censured. Upon the assumption that Hahn acted innocently in dealing with Lasker and that in the hour of need he was deserted by Chadbourne and Levy, both his actions and words concerning the Sullivan loan are beyond my jurisdiction. When Lasker began to press him, Hahn, as doubtless he will admit, acted with poor judgment, and in a manner which has rightfully subjected him to the ordeal of this proceeding. But, upon the proof, I cannot adjudge him to have been guilty of improper conduct as regards the allegations set forth in his petition. As to him, the petition will be dismissed.