In the Matter of LOUIS S. LEVY, an Attorney, Respondent.

First Department, November 22, 1940.

*Timothy N. Pfeiffer* of counsel [*Einar Chrystie* with him on the brief], for the petitioner.

*Mortimer Hays* of counsel, for the respondent.

MARTIN, P. J.   The respondent Louis S. Levy was admitted to practice as an attorney and counselor at law of the State of New York by this court on February 17, 1902.   The Association of the Bar of the City of New York on December 19, 1939, filed charges against him alleging professional misconduct.   The respondent served an answer thereto and a referee was appointed to hear the testimony.   The report of the referee states that the charges set forth in the petition have been sustained and that the respondent was guilty of professional misconduct.

The conduct of Mr. Levy was the subject of a disciplinary proceeding in the United States District Court for the Southern

District of New York (*Matter of Levy*, 30 F. Supp. 317). The decision in that proceeding, as pointed out by the referee in his report, is "not binding or of any force in this proceeding." The facts which are the basis for this disciplinary proceeding have been fully set forth in the opinion in the Federal court, rendering necessary a recital, herein, of only the more important details.

In the spring of 1932 there were pending in the United States Circuit Court of Appeals, Second Circuit, appeals in two stockholders' representative actions instituted on behalf of the American Tobacco Company against certain of the officers of the company and growing out of a bonus plan by which the officers and employees were permitted to subscribe for shares of the common stock of the company at twenty-five dollars a share at a time when the stock was being sold in the market in excess of $100 a share. The claimed liability of the defendants amounted to millions of dollars. The defendants were represented by the law firm of which respondent Levy was a member. Martin T. Manton was then senior judge of the Circuit Court of Appeals in the Second Circuit and respondent's relations with Manton were intimate and friendly. Levy had known Manton since their law school days; had interested a partner in Manton's ambition to secure an appointment to the Federal court, and in the prosperous days of the 1920's had become a stockholder financially interested in a manufacturing corporation in which Manton was the dominating factor. He was familiar with Manton's ventures in connection with commercial and real estate enterprises and, in fact, had taken an active interest in an effort to dispose of a large parcel of real estate controlled by Manton.

While the American Tobacco Company litigation was pending in the court of which Manton was senior member, Manton was in serious financial difficulties and respondent knew of the situation. Through respondent's assistance there was made available to Manton the proceeds of what has been called a "loan" of $250,000. The moneys which benefited Manton were furnished by an agency known as Lord and Thomas, Inc., through Mr. Albert D. Lasker who was then and had been for many years the principal owner of that company. Lord and Thomas, Inc., as advertising counsel had received millions of dollars in commissions from the American Tobacco Company. There was no apparent reason for the advertising agency of the tobacco company making the loan to Manton. It was first approached as a medium for making the loan by Paul M. Hahn who was then assistant to the president of the American Tobacco Company. He knew the importance of the stockholders' litigation; he had been a junior partner in respondent's law firm

and, in fact, owed his position there and his more important position with the tobacco company to the respondent's interest in him. The referee has found that " * * * Manton used Sullivan and Levy used Hahn and succeeded in arranging the loan through Lasker in the offices of the American Tobacco Company." As a result of Hahn's activities in the loan transaction here under review, he was made a respondent, with Levy, in the disciplinary proceedings in the Federal court. He escaped censure there, the suggestion being that he was a victim of the imposition of this respondent.

Relief to Manton took the form of a loan to one James J. Sullivan who had been associated with Manton in his commercial and real estate ventures. The report of the referee points out that Levy knew that Sullivan was a " dummy " acting for Manton, and the referee properly characterizes the arrangement for the " loan " as a plan to conceal the real transaction.

In June, 1932, at about the time the funds were placed at the disposal of Manton, a two-to-one decision was rendered in favor of the defendants in the American Tobacco Company litigation by the Circuit Court of Appeals in the Second Circuit, and the prevailing opinion was written by Judge Manton. The charge here under consideration grew out of Levy's activities during the pendency of that litigation.

Throughout the hearing before the referee an effort was made to prove that the so-called loan of $250,000 to Manton in reality was initiated by respondent's law partner, Thomas L. Chadbourne, and that respondent was merely a conduit for the carrying through of the arrangements. In 1938, prior to the institution of disciplinary proceedings against the respondent, Chadbourne died. As frequently happens in proceedings of this character, the blame is sought to be placed on a dead man. However, in this proceeding, documentary evidence directly connected respondent with the transaction and destroyed his claim to the role of messenger. Four days after Chadbourne had sailed for Europe, a letter dated April 26, 1932, purporting to have been written by Sullivan was sent to the respondent. Only after it became apparent that the receipt of this letter could not be successfully denied did the respondent admit its receipt. The letter referred to the loan of $250,000 " which we are endeavoring to place through you " (respondent). It was established that this letter was typed by Manton's secretary on the same typewritter on which Manton was at that time corresponding with respondent concerning one of the former's real estate ventures, and Sullivan's name was placed at the foot of the letter by Manton's secretary. The paper

on which it was written bore the government watermarks. It is evident that Levy and those associated with him clearly appreciated the damaging effect of this letter. The history of this important piece of evidence leaves no doubt that an attempt was made to conceal it from the scrutiny of those investigating respondent's connection with the entire matter. Before the Federal grand jury, in the early part of 1939, Levy testified, in answer to a direct question, *that he had no correspondence whatsoever about the Sullivan loan.* He now admits that he received the letter in question, but maintains that it had completely passed out of his memory until it was shown to him by one of his partners on July 19, 1939, a few days before the hearings in the disciplinary proceeding in the Federal court. The record shows that in February, 1939, while respondent was appearing before the grand jury, one of his associates was delegated to assemble the factual data in the matter. In a file containing other papers the letter in question was turned over to respondent's partner, David S. Hecht, by a former associate, George W. Whiteside, who, at that time, commented on the importance of the letter. Whiteside clearly knew its value as evidence. The letter remained in Hecht's possession from February 23, 1939, until March 4, 1939, when Hecht returned the file to Whiteside, despite the latter's protestations. The file and the letter remained in Whiteside's office until June 22, 1939, when Hecht again took possession thereof. Meanwhile, Whiteside had spoken to another of respondent's partners, J. Arthur Leve, regarding the importance of this letter. Any experienced lawyer would appreciate its importance as evidence.

On July 13, 1939, the United States Attorney served a subpœna upon the respondent calling for the production of all correspondence and all papers and records received from Manton. On July 14, 1939, there were forwarded to the United States Attorney documents and papers described as those found as the result of a search. *The important letter was not inclosed.* Beyond peradventure of a doubt, the existence of the letter of April 26, 1932, was then known to respondent and respondent's office. It appears that on July 13, 1939, arrangements had been made with the United States Attorney by a member of the Whiteside firm whereby they were to make accessible to the United States Attorney copies of all papers from Whiteside's office to respondent or his office. On July 19, 1939, a conference was had which was attended by respondent's partner Leve, Whiteside and George Z. Medalie, attorney for Hahn in the disciplinary proceedings then pending in the Federal court against Hahn and the respondent. Whiteside then told Leve and Medalie that the letter of April 26, 1932, was among

the papers delivered by his office to the office of the respondent. He also stated that the stipulation with the United States Attorney included the letter. It was on this date that it is claimed the letter was once more brought to the attention of the respondent. The referee states in his report that Levy knew of the contents of this letter before July 19, 1939, and that his testimony that he had forgotten about this important letter is unworthy of belief. The amount of jugglery surrounding the withholding of this important piece of correspondence and its reluctant production is characteristic of the lack of frankness shown by the respondent throughout the record. He was practically forced to reveal the existence of this important letter. Knowing its value as evidence he must have realized that if produced, his guilt would be established; hence, its attempted suppression.

Authorities are cited to support the contention of the respondent that the mere relationship of debtor and creditor between a judge and counsel will not disqualify a judge, and that, therefore, the respondent was under no duty to disclose the situation. An examination of the entire record and a careful consideration of all of the testimony in relation to the conduct of the respondent in connection with the so-called loan, in form to Sullivan, but in reality for Manton's benefit, justify the inference that respondent was motivated by the desire to bring about a decision in favor of the interests which he represented. If the matter were a mere loan to Sullivan, there would have been no need for such concealment. The transaction between respondent and Manton was somewhat similar to those which led to Manton's conviction on an indictment charging conspiracy to obstruct the administration of justice and to defraud the United States of and concerning its right to have the lawful functions of the judicial powers of the United States exercised and administered free from unlawful impairment and obstruction. ( *United States* v. *Manton*, 107 F. [2d] 834; certiorari denied, 309 U. S. 664.)

In affirming that conviction, Judge SUTHERLAND, writing for the Circuit Court, said, among other things: " Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the correctness of judicial action *taken for a price* removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice MARSHALL more than a century ago, that the judge must be ' perfectly and completely independent with nothing to influence or control him but God and his conscience.' "

It is essential, for the preservation of a democratic form of government, that the judiciary be free and uninfluenced in the protection and enforcement of public and private rights. The courts of justice in this country have generally maintained a high standard of integrity and have been respected because of impartiality and incorruptibility. It is unfortunate that the actions of any judge should be affected by any sinister influence. This court has not hesitated to remove judicial officers whose conduct warranted such action. Members of the bar are bound by their oath of office so to conduct themselves that nothing they may do will bring into disrepute the judicial department of our government or lessen the respect which the public has at all times entertained for it. A lawyer renders no service to himself, his client or the community when he uses corrupt means to bring about a decision favorable to the cause he represents. The great harm he may do has been forcibly demonstrated by the present case.

The New York State Bar Association has adopted, among others, the following canon of ethics:

" 32. The Lawyer's Duty in Its Last Analysis.— No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive, nor should any lawyer render, any service or advice involving disloyalty to the law whose ministers we are, or disrespect to the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation.   *   *   *   But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen."

In *Bartos* v. *United States District Court* (19 F. [2d] 722) the Circuit Court of Appeals, Eighth Circuit, said: " The office of an attorney is one of dignity and power in which fidelity both to the court and to clients is imperative. It carries with it a duty to assist in the administration of justice. The right conferred to appear for suitors at the bar is not an absolute one, although as said in *Ex parte Garland* [4 Wall. 333] it ' is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the Legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency.' As an officer of the court an attorney is under obligation not to intentionally be a law-breaker; not to impede the administration of justice; not to violate the Constitution of the United States; not to bring the court of which he is an officer into disrespect; not to hinder the

enforcement of law or popularize the breach thereof. It is a breach of his official duty to intentionally bring reproach upon the legal profession or the court, to alienate favorable public opinion from the court, and when he does these things he is guilty of professional misconduct even though his acts be not misdemeanors involving moral turpitude. The profession of attorney at bar is not merely an instrumentality for making money. There are reciprocal duties and obligations involved."

Within the last decade this court has become all too familiar with acts of attorneys who, under pressure of economic necessity, have transgressed the bounds of professional good conduct. This is not such a case. The respondent here claims to have " achieved a position of eminence and distinction and a reputation which few achieve at the Bar." That claim may be true. No doubt he has been financially successful. He has been a member of a law firm whose practice has been reputed to be very large and lucrative, and the record discloses that the annual overhead of the firm was approximately $600,000. His educational advantages and opportunities have been such as to lead to the expectancy of sterling character and scrupulous observance of high ethical standards. He has failed to keep within the spirit of the law, and has shown a lamentable lack of ethical values and principles, essential alike to those in important or unimportant places. The record establishes that respondent is unfit to remain a member of the bar of this State.

While the conduct of Levy only is before this court, some of the other principals in this transaction are not without blame. They were men of vast experience, some quite sophisticated, who fully realized the true significance of their acts and the purpose of same and should not have participated in any such subterfuge.

The motion to confirm the report of the referee should be granted, and the respondent disbarred.

TOWNLEY, COHN and CALLAHAN, JJ., concur; O'MALLEY, J., concurs in result.

Respondent disbarred.