IN RE PROFESSIONAL ETHICS: COMMUNITY EDUCATION PROGRAM OF MONTANA LEGAL SERVICES ASSOCIATION, BARNEY REAGAN, DIRECTOR AND GARY G. DORAN, STAFF ATTORNEY, PETITIONERS.

No. 12356.
Submitted Sept. 28, 1972.
Decided Nov. 28, 1972.
503 P.2d 531

Barney Reagan and Gary G. Doran argued, Helena, for petitioners.

Henry Loble argued, Helena, for Mont. Bar Assn., amicus curiae.

PER CURIAM:

This matter comes to the Court by application of the Director of the Montana Legal Services Association for guidance and counsel on matters concerning the Canons of Professional Ethics Nos. 27 and 28. The Canons adopted by this Court appear in 145 Mont. xxxii, xxxiii. This Court granted a hearing under its power to regulate the practice of law in Montana. See: In re Unification of the Montana Bar Asssociation, 107 Mont. 559, 87 P.2d 172; In re Unification of the Bar of this Court, 119 Mont. 494, 175 P.2d 773; Application of the Montana Bar Association, 140 Mont. 101, 368 P.2d 158; Section 93-2019, R.C.M.1947; Rule 17, M.R.App.Civ.P.

In our order of September 11, 1972 granting the hearing, we permitted amicus curiae to appear. The Montana Bar Association has appeared by brief.

Montana Legal Services Association was incorporated under the laws of the state of Montana on May 5, 1966 for " * * * the promotion of and assistance in, directly or indirectly, the pro-

vision of broader and more adequate legal representation for indigent persons resident in the state of Montana * * *.''

This nonprofit corporation was sponsored and formed by the Montana Bar Association. It was funded initially by a grant from the Office of Economic Opportunity. Since July 1, 1969, it has also received a further grant from the Office of Health, Education and Welfare to extend these services to every corner of Montana.

Initially, the Office of Economic Opportunity funded neighborhood offices in Butte, Great Falls, Missoula, Helena, and Billings. Circuit Rider offices were established in Wolf Point, Hardin, Havre, and Cut Bank to serve those rural geographical areas surruonding these towns. Sanders, Lake and Ravalli Counties were served under a Judicare concept. In each of these Office of Economic Opportunity sponsored areas a local committee operates to oversee operations of the attorneys operating there. These local committees are composed of four attorneys and three lay persons.

Since July 1, 1969, the Office of Health, Education and Welfare has funded five more Circuit Rider projects operating out of Glendive, Miles City, Bozeman, Lewistown and Anaconda. Lincoln and Flathead Counties were added under the Judicare program.

Montana Legal Services Association has a State Board of Trustees that sets broad policy and actually runs the corporation through its administrative staff in the central office in Helena. The State Board at present is made up of 34 members. Twenty are attorneys, twelve represent the clientele to be served, one represents the A. F. L. - C. I. O. and one represents the Montana Chamber of Commerce.

The attorneys employed throughout the program work full time and carry on no outside practice of law. These attorneys provide legal services, in civil matters, only to those persons or groups which are financially unable to employ a lawyer, under the criteria and guidelines set by the State Board of Trustees. If

for any reason the person seeking legal assistance cannot be served, the applicant is referred to a private attorney under a referral plan approved by the local Bar in that area.

The entire concept embodied in Montana Legal Services Association is based upon the proposition that the program and its attorneys are not in competition with the private Bar but supplement and help fulfill those professional responsibilities which are incumbent upon all of us as lawyers.

At the present time, Montana Legal Services Association operates fifteen law offices and provides Judicare services in five western counties. It has a total annual budget in excess of $750,000, all of which is being spent in Montana. These funds not only pay for staff and supplies, but are used for direct payment for services to the lawyers in five western counties under the Judicare program.

The program provides direct legal services to thousands of Montanans and to many for the first time ever. It is a professional program designed to provide professional services for qualified indigents in civil matters only.

The Office of Economic Opportunity Legal Services was created under the provision of Section 222 of the Economic Opportunity Act of 1964, as amended. Office of Economic Opportunity rules and regulations growing out of the Act govern the broad policy operation of the entire Office of Economic Opportunity funded Legal Services program nationally.

Agreement with the Office of Health, Education and Welfare allows the Montana Legal Services Association to administer its portion of this project under the same Office of Economic Opportunity Act and regulations is a requirement that all Legal Services programs engage in ''Community Education''.

It is this ''Community Education'' concept that prompts the application for guidance from this Court, under Canons 27 and 28 which state:

''27. Advertising, Direct or Indirect.

''It is unprofessional to solicit professional employment by

circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; but the customary use of simple professional cards is not improper.

"Publication in reputable law lists in a manner consistent with the standards of conduct imposed by these canons of brief biographical and informative data is permissible. Such data must not be misleading and may include only a statement of the lawyer's name and the names of his professional associates; addresses, telephone numbers, cable addresses; branches of the profession practiced; date and place of birth and admission to the bar; schools attended; with dates of graduation, degrees and other educational distinctions; public or quasi-public offices; posts of honor; legal authorships; legal teaching positions; memberships and offices in bar associations and committees thereof, in legal and scientific societies and legal fraternities; the fact of listings in other reputable law lists; the names and addresses of references; and, with their written consent, the names of clients regularly represented. A certificate of compliance with the Rules and Standards issued by the Standing Committee on Law Lists of the American Bar Association may be treated as evidence that such list is reputable.

"It is not improper for a lawyer who is admitted to practice as a proctor in admiralty to use that designation on his letterhead or shingle or for a lawyer who has complied with the statutory requirements of admission to practice before the patent office, to so use the designation 'patent attorney' or 'patent lawyer' or 'trademark attorney' or 'trademark lawyer' or any combination of those terms."

"28. Stirring Up Litigation, Directly or Through Agents.

"It is unprofessional for a lawyer to volunteer advice to bring a law suit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit or collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the Bar having knowledge of such practices upon the part of any practitioner immediately to inform thereof, to the end that the offender may be disbarred."

We are aware that general statements are risky; but in order to attempt to focus our discussion we will make some general observations.

■ The indigent need education as to their legal rights to insure equal protection of the law. The purpose of the "Community Education" program ought to be confined to making the poor aware of their legal rights and the availability of legal services without regard to their ability to pay, so as to bring them under the equal protection of the law. Just how much disparity occurs between classes of people such as "poor", "middle class", or "rich" as to their knowledge or appreciation of legal services or legal rights is impossible to assess, because poverty transcends intelligence, education, and ability in varying degrees.

However, the problem is not whether education is desirable—

it always is. The problem is the means to accomplish it. An educational program for poor people concerning legal services need not be offensive to professional ethics any more than education concerning health habits and birth control would violate medical professional ethics.

■ So long as the program is dignified in tone, does not promote or advertise individual attorneys, does not in and of itself stir up or promote litigation either in individual cases or to promote a cause, it does not constitute unprofessional conduct.

■ It is like walking a tight rope blindfolded to attempt to set up guidelines in the abstract. It is obvious that certain legal knowledge will inevitably lead to litigation; but this alone is not the unethical conduct prohibited by the Canons. Rather, the Canons are directed at the individual lawyer who for private gain or other ulterior motives, would unduly and unfairly advertise his services or promote a public or private conduct adverse to the general good.

Accordingly, we set forth the following guide as an aid to the Montana Legal Services Association in conducting its education program:

(a) It may advertise the existence, location, telephone numbers and services of its offices.

(b) Any recognized advertising medium may be used to reach the desired recipients.

(c) The materials used should relate to general legal problems and not attempt to advise specific persons concerning individual legal problems in the absence of any attorney-client relationship.

(d) The materials used should be accurate, practical, and understandable to those to whom directed.

(e) The materials should scrupulously avoid naming individual attorneys.

(f) This Court does not approve the use of community educational programs to foster political reforms allegedly designed to make the legal system more responsive to the needs of the poor.

The foregoing guidelines should be supplemented by study of

the opinions, both formal and informal, of the Committee on Professional Ethics of the American Bar Association as applied to individual problems. We have confidence that the State Board of Trustees of Montana Legal Services Association will be able to properly guide specific activities within the bounds of professional ethics.

We also suggest as an additional guideline Canon 2 of the American Bar Association's Code of Professional Responsibility and Canons of Judicial Ethics. Although this Code has not yet been formally adopted by this Court, it is currently being readied for adoption. Therein, in Canon 2-1, it is said:

''The need of members of the public for legal services is met only if they recognize their legal problems, appreciate the importance of seeking assistance, and are able to obtain the services of acceptable legal counsel. Hence, important functions of the legal profession are to educate laymen to recognize their problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.''

We think our previously set forth guide will accomplish those aims.